No. 35,143

THE STATE OF KANSAS, ex rel. A. B. MITCHELL (substituted), as Attorney General, *Plaintiff*, v. THE SAGE STORES COMPANY, and CAROLENE PRODUCTS COMPANY, *Defendants.*

(141 P. 2d 655)

Opinion filed October 2, 1943.

*C. Glenn Morris* and *Warden L. Noe*, both of Topeka, argued the cause, and *A. B. Mitchell*, attorney general, was on the briefs for the plaintiff.

*Tinkham Veale*, of Topeka, argued the cause for defendant The Sage Stores Company; *Boyle G. Clark*, of Columbia, Mo., and *T. M. Lillard*, of Topeka, argued the cause, and *Paul M. Peterson* and *W. L. Nelson, Jr.*, both of Columbia, Mo., were on the briefs for defendant Carolene Products Company; *John C. Grover*, of Kansas City, Mo., and *Clark, Boggs, Peterson & Becker*, of Columbia, Mo., of counsel.

The opinion of the court was delivered by

WEDELL, J.: This is an original action in quo warranto, instituted by the state on the relation of the attorney general, to oust the defendant, The Sage Stores Company, a Kansas corporation, chartered to transact a general mercantile business, from doing business in this state on the ground it is unlawfully keeping for sale and selling a "filled-milk" product under the trade names of Milnot and Carolene. The product is manufactured and distributed by defendant Carolene Products Company, a Michigan corporation.

Plaintiff's amended petition alleged the latter corporation, although not authorized to do or doing business in Kansas, had an interest in the product, that an actual controversy had arisen concerning the lawful sale of its product and that it should be made a party defendant in the litigation. The defendants filed separate answers.

The statute involved is G. S. 1935, 65-707, and is commonly known as the "filled-milk" statute. The particular portion thereof alleged to have been violated is subdivision (F) (2), which reads:

"It shall be unlawful to manufacture, sell, keep for sale, or have in possession with intent to sell or exchange, any milk, cream, skim milk, buttermilk, condensed or evaporated milk, powdered milk, condensed skim milk, or any of the fluid derivatives of any of them to which has been added any fat or oil other than milk fat, either under the name of said products, or articles or the derivatives thereof, or under any fictitious or trade name whatsoever."

In addition to facts previously stated plaintiff's amended petition, insofar as material, in substance, alleged:

The defendant, Carolene Products Company, was organized for the purpose of engaging in the distribution of milk products and derivatives thereof (the petition named the milk products enumerated in the statute) and defendant, The Sage Stores Company, unlawfully has in its possession and is unlawfully selling in this state such milk products to which have been added various fats and oils *other than milk fat* under the fictitious trade name of Carolene and Milnut; such acts are in violation of the milk, cream and dairy public health laws of this state, article 7, chapter 65, General Statutes of Kansas, and particularly G. S. 1935, 65-707 (F) (2); The Sage Stores Company, according to its annual statement filed with the secretary of State for the year 1940, described its business to be "retail groceries and meats"; the state of Kansas is a market for the

product of the Carolene Products Company and The Sage Stores Company and other retailers are market outlets for such products if they can be sold lawfully in Kansas; by reason of the described unlawful acts of The Sage Stores Company it has misused and abused the franchises, privileges and authority conferred upon it; such unlawful acts have been of great harm and injury to the general public and the state.

Plaintiff prayed that The Sage Stores Company be ousted, restrained and enjoined from transacting any further business under its charter and that defendant, Carolene Products Company, be restrained and enjoined from distributing and selling its product in this state.

The pertinent portions of the separate answers filed by the defendants are identical or sufficiently similar to make it unnecessary to duplicate the averments thereof. This court appointed the Hon. J. B. McKay, of El Dorado, as its commissioner, directed him to take testimony and to make findings of fact and conclusions of law. His findings of fact are appended to this opinion and made a part hereof. The commissioner has referred to the Carolene Products Company as the defendant. In order to avoid confusion we shall do likewise. In the hearing before the commissioner the parties stipulated concerning some facts alleged in defendant's answer which were denied in plaintiff's reply. The stipulated facts are embodied in the commissioner's findings of fact and constitute the first eleven paragraphs thereof. The answer of the defendant is quite voluminous. In setting forth such averments thereof as were in substance later admitted, we shall refer to such facts alleged in the answer by directing the reader to pertinent stipulated findings of fact.

The answer denied: That defendant at the institution of this suit, or at any time thereafter, had shipped into Kansas for sale or had sold any products containing *coconut oil* in violation of the previous decision of this court; that its present products, Carolene and Milnot, contained *coconut oil* and alleged that among other ingredients they contained *cottonseed oil*. (For admissions of averments in the answer pertaining to products defendants were selling or distributing at the time the stipulation was made, the ingredients thereof, the sanitary method of their manufacture and distribution and the labels used on the products, see findings 2 to 11, inclusive.)

From the above admissions it is clear the ingredients of Carolene

and Milnot are identical. We shall therefore hereafter refer to them as defendant's product instead of products.

Defendant's answer, in substance, further alleged: The natural ingredients of its product are each and all wholesome and none of them is damaged in the process of manufacturing the completed product; defendant's completed product is not deleterious or unwholesome but on the contrary is wholesome and nutritious; vitamins A and B are fat solubles; in vitamin A and B content defendant's product is superior for human need to whole milk and evaporated whole milk for the reason that such vitamin content fluctuates in whole milk or evaporated whole milk, depending upon the season, the feed of the cow, the breed of the cow and the condition of the cow, whereas the vitamin A and B content in defendant's product is superior in both quantity and uniformity; defendant's product with respect to the remaining vitamins in whole milk or evaporated whole milk, is demonstrably superior; at the time the law in question was enacted defendant's product was unknown; defendant's fortified milk product has come to be regarded by biochemists, physicians, dietitians and nutritionists as wholesome, healthful, growth-producing, nutritious and beneficial generally as a food in every respect; its product is unusually well fitted as an infant food and is used in many instances where whole milk or evaporated whole milk cannot be fed to infants; the product is not sold in imitation of milk but is properly and plainly labeled with a prominent warning that it is not evaporated milk or cream; defendant's product complies in all respects with the federal food and drug laws and with all Kansas laws relating to and prohibiting the adulteration and misbranding of food products; there is no foundation in fact for the presumption and charge that defendant's product is adulterated or that its sale is a fraud on the public; there is no difference of opinion concerning the wholesomeness and sufficiency of the product as a milk compound and the vitamin sufficiency thereof; there is no rational basis for prohibiting the manufacture, possession or sale of defendant's product.

The answer, in substance, further alleged: Much skimmed milk is now wasted, fed to animals, or discarded and the public is deprived of the benefits of the supply of this highly nutritive and essential food; the cost of evaporated milk and whole milk is so high as to make it prohibitive for general consumption; the manu-

facture of defendant's product not only permits utilization of the butterfat in the form of butter and cream, after separation, but preserves for the public use at low prices the skimmed milk which otherwise would be unavailable and the product is, therefore, a great benefit to the public rather than a detriment; by reason of the use defendant makes of skimmed milk the farmer and dairyman are paid a higher price for the surplus milk than they receive from the whole milk evaporator, the fluid milk distributor and pasteurizer, or from any other processor of milk products; while extending the benefits of milk consumption by producing a cheaper and superior product from the skimmed milk, the manufacturer of the product is at the same time able to increase the income of the farmer and dairyman engaged in the production of milk, with the result that a benefit rather than a detriment accrues to the public; the prohibition of the manufacture, sale or possession of defendant's product, and criminal punishment therefor, notwithstanding the product is a wholesome nutritious food product rich in vitamins, is unconstitutional and void for the following reasons:

"(a) Such prohibition and punishment under any statute relating thereto and not embracing generally all food containing oil or fat, other than milk fat, or all foods in which milk and oil or fat, other than milk fat, are compounded is in violation of section 17 of article II of the constitution of Kansas, prohibiting the enactment of a special law where a general law can be made applicable.

"(b) Such prohibition and punishment violates section 1 of the bill of rights of the constitution of Kansas by denying to this defendant its natural and constitutional rights of life, liberty and the pursuit of happiness.

"(c) Such prohibition and punishment deprives this defendant of its liberty and property without due process of law in violation of the fourteenth amendment to the constitution of the United States, and deprives this defendant of the equal protection of the laws of the state of Kansas in violation of said constitutional provisions, and abridges the privileges and immunities of this defendant as a citizen of the United States in violation of said constitutional provisions.

"(d) The prohibition of the sale of a pure, wholesome, sanitary, nutritious, and unharmful food compound, and punishment therefor, is contrary to public policy, is an arbitrary and unreasonable interference with private persons, is wholly without the scope of the police power, is an unreasonable and unnecessary restriction upon trade, and is therefore unlawful, oppressive and unrelated to the health, welfare, safety or morals of the people of this state or any of them."

Defendant's answer also, in substance, alleged:

Various milk products (naming them) which are fortified with

fat or oil, other than milk fat, are being sold in the state without interference by state or county officials; if the sale of defendant's product is prohibited by the statute, such other products are likewise prohibited; action to prohibit only the sale of defendant's product constitutes a denial to defendant of the equal protection of the laws of this state and constitutes enforcement of the laws in a manner that abridges the privileges and immunities of defendant as a citizen of the United States, all in violation of the first section of the fourteenth amendment to the constitution of the United States.

Plaintiff filed a separate reply to the separate answers of the defendants. The replies are identical or sufficiently similar, with respect to essential matters, to make it unnecessary to duplicate the contents thereof. We shall summarize the material averments of the reply to the answer of the defendant Carolene Products Company. The reply denied that failure to bring actions to prohibit the sale of other milk products to which fat, other than milk fat, had been added constituted a defense to the present action and alleged such averments should be stricken from the answer. Plaintiff's reply contained the same denial and made the same request with respect to defendant's answer which raised economic issues and which pertained to the effect of the manufacture and sale of defendant's product upon the dairy industry.

The court, after the completion of the pleadings and prior to the hearing before the commissioner, sustained plaintiff's motion relative to averments in the answer which charged discriminatory enforcement of the law (see finding 54) and overruled plaintiff's motion touching the other defenses mentioned in the last preceding paragraph.

The reply admitted the averments of defendant's answer with respect to the contents, or ingredients, of defendant's product, the sources of its ingredients and the manner in which the product was manufactured. (See findings 6, 7, 8, 9 and 11.)

The reply, in addition to a general denial of all averments not admitted, in substance, further alleged:

Defendant's product is the identical product heretofore condemned by this court in the case of *Carolene Products Co. v. Mohler*, No. 34,307 (152 Kan. 2, 102 P. 2d 1044), with the exception that the defendant's present product, Carolene and Milnot, contains cottonseed oil where the former product, Carolene and Milnut, contained coconut oil; irrespective of the trade name, the product is not milk,

is inferior to the natural product, milk; the statute prohibits the addition of any fat or oil, other than milk. fat, to milk in any of the forms or derivatives named in the statute; the statute is designed to protect the public health, morals and welfare of the people and to prevent fraud and deception in the purchase and consumption of milk, cream and other dairy products and violates no provision of the state or federal constitution.

After the introduction of evidence before the commissioner was concluded defendants, with consent of the court, were permitted to file supplemental answers in which they, in substance, alleged:

The prohibition of the sale of its product, Milnot and Carolene (a liquid product), and the permission by the state to sell for infant and human consumption other combinations of dried milk, skimmed milk and milk derivatives and vegetable oils constitute arbitrary and unreasonable discrimination against the defendant and denies to it the equal protection of the law; the statute constitutes the enactment of a special law where a general law can be made applicable; the statute violates state and federal constitutional provisions (previously designated in its answers); it appears from the statute itself that it is not a health measure.

Touching the subjects of the commissioner's permission to introduce additional testimony after the filing of the supplemental answer, the rejection of the offer by the parties and the question of the validity of the statute itself, see finding 55.

The foregoing summary of the pleadings, considered in connection with the facts agreed upon by the parties, quite clearly discloses the remaining questions of fact upon which issues were joined. This summary also discloses the general legal contentions of the parties which it is unnecessary to repeat.

The report of the commissioner discloses the extensive scope and character of the evidence introduced and the eminence of the expert witnesses in their respective fields. Those subjects require no further comment. Requests for findings of fact and conclusions of law were submitted to the commissioner by both parties. Defendants have excepted to the failure of the commissioner to make certain findings of fact and conclusions of law requested by them. Defendants have also excepted to certain findings of fact and to the conclusions of law made by the commissioner. We have considered the grounds of the various exceptions. Plaintiff asks for judgment on the commissioner's findings of fact and conclusions of law.

This is an original action in this court. Findings of fact made by the commissioner are advisory only and do not have the effect of finality accorded to findings of fact made by a trial court. In the latter type of case we examine the record only sufficiently to determine whether there is substantial testimony to support the findings made and not whether there is evidence which would support, or would tend to support, contrary findings, if made. In an original action, such as the instant one, the findings of the commissioner being challenged are not conclusive but are advisory only. Under such circumstances it is the duty of this court to examine the entire record for the purpose of reaching its own independent conclusions. (*State, ex rel., v. McKnaught,* 152 Kan. 689, 690, 107 P. 2d 693, and cases therein cited.)

The fact that ultimate responsibility to determine the facts and to reach a conclusion remains with the court does not mean, however, that the findings of the commissioner are not helpful. In *Hunt v. Gibson,* 99 Kan. 371, 161 Pac. 666, it was said:

"Being challenged, the commissioner's findings are advisory only. In the solution of doubtful questions of fact, some weight may be given them because the commissioner had the advantage of personal observation of the witnesses while they were undergoing examination. With this exception the court considers the evidence as though it had been taken by deposition." (p. 375.)

In keeping with the court's responsibility it has examined the record and after careful consideration thereof has concluded that while some exceptions have some merit, the findings on material matters are substantially correct. We have concluded that if certain additional requested findings, which have evidentiary support and which defendants contend are necessary to a proper determination of this case, had been included in the findings made, such fact would not require conclusions of law contrary to those made by the commissioner. For example, defendants take exception, on various grounds, to finding 53. The exceptions go primarily to the affirmative finding with respect to the inferiority of defendant's product as to certain nutritive ingredients as compared with the nutritive value of whole milk or evaporated whole milk. There is competent evidence to support that finding. There is also competent testimony of experts that as to certain vitamins, particularly A and D, defendant's product is superior to evaporated whole milk and that it is preferred by them to evaporated whole milk or the special-purpose infant foods in the diet of infants under their care. (Finding 52.)

For the purpose of determining the constitutionality of the law in question it is immaterial whether we believe defendant's product when considered as a whole is inferior, equal or superior to whole milk or exaporated whole milk if substantial disagreement in fact exists with respect to the inferiority of the product as compared with whole milk or evaporated whole milk, and the legislature has some basis for believing a filled-milk product is likely to be sold or is susceptible of being sold as and for whole milk or evaporated whole milk with the result that the public may be deceived thereby. In other words, in the view we take of the law governing this case the sale of a filled-milk product, although wholesome and nutritious, may be constitutionally prohibited as well as merely regulated if the legislature has some basis for believing the product is inferior to whole milk or evaporated whole milk and that the sale of the product offers an opportunity for fraud and deception and that prohibition rather than mere regulation of its sale is necessary for the adequate protection of the public health or general welfare. We think there was a sufficient basis for the exercise of legislative judgment as to a filled-milk product and the remedy adopted to effect the legislative purpose.

Our independent examination of the record leads us to believe that notwithstanding the label correctly describes the contents of the product and conforms to the regulations and requirements of the federal food and drug administration and notwithstanding the fact the defendant Carolene Products Company puts into the cases of its product a "Notice" stating, among other things, "It is improper to advertise, represent, display or sell either of these products as milk, or evaporated milk or cream," the product nevertheless in numerous instances is sold as canned milk by dealers, accepted as such by some customers, and is used as advertised by the defendant Carolene Products Company to wit:—"Milnot can be used for all culinary purposes wherever you now use whole milk, cream, whipping cream, or a canned milk."

As a result of our study of the record and in view of what already has been said, we have concluded the material findings of the commissioner are substantially accurate and sufficiently extensive to form a proper basis for the formulation of conclusions of law. The following conclusions of law made by the commissioner are supported by authorities indicated thereunder by the court:

"1. The statute in question (G. S. 1941 Supp. 65-707 (F) (2)

has a two-fold purpose: (1) Preservation of the public health, and (2) prevention of fraud and deception on the consumers of the state." (*Carolene Products Co. v. Mohler*, 152 Kan. 2, 8, 102 P. 2d 1044 [1940]; *Hebe Co. v. Shaw*, 248 U. S. 297, 63 L. Ed. 255, 258 [1919]; *U. S. v. Carolene Products Co.*, 304 U. S. 144, 149, 82 L. Ed. 1234 [1938]; *Carolene Products Co. v. Wallace*, 27 F. Supp. 110, 112 [1939]; *Carolene Products Co. v. Harter*, 329 Pa. 49, 197 Atl. 627, 119 A. L. R. 235 [1938].)

"2. Every presumption must be indulged in favor of the validity of legislative acts. Before a statute enacted in the exercise of the police power can be held unconstitutional, it must be shown that there was no conceivable reason for the legislative act." (*Carolene Products Co. v. Mohler*, 152 Kan. 2, 8, 10, 102 P. 2d 1044, [1940]; *O'Gorman & Young v. Hartford F. Ins. Co.*, 282 U. S. 251, 75 L. Ed. 324 [1931]; *Hebe Co. v. Calvert*, 246 Fed. 711, 717 [1917]; *Setzer v. Mayo*, 150 Fla. 734, 9 So. 2d 280, 281 [1942].)

"3. If the character or effect of an article, as intended to be used, be debatable, the legislature is entitled to its own judgment, and its judgment cannot be superseded by the views of the court." (*Carolene Products Co. v. Mohler*, 152 Kan. 2, 8, 102 P. 2d 1044 [1940]; *Powell v. Pennsylvania*, 127 U. S. 678, 685, 32 L. Ed. 253 [1888]; *Hebe Co. v. Shaw*, 248 U. S. 297, 303, 63 L. Ed. 255 [1919]; *U. S. v. Carolene Products Co.*, 304 U. S. 144, 154, 82 L. Ed. 1234 [1938]; *Hebe Co. v. Calvert*, 246 Fed. 711, 717 [1917]; *Carolene Products Co. v. Evaporated Milk Ass'n*, 93 F. 2d 202, [1937]; *Carolene Products Co. v. Wallace*, 27 F. Supp. 110 [1939]; *Setzer v. Mayo*, 150 Fla. 734, 9 So. 2d 280 [1942].)

"4. The constitutionality of an act may be challenged on the ground that it has no rational basis, as applied to a particular article, or that the facts which existed when the statute was enacted have ceased to exist, but such inquiries, where the legislative judgment is drawn in question, must be restricted to the issue whether any state of facts, either known or which could reasonably be assumed, affords support for the act." (*Weaver v. Palmer Bros. Co.*, 270 U. S. 402, 70 L. Ed. 654, [1926]; *U. S. v. Carolene Products Co.*, 304 U. S. 144, 154, 82 L. Ed. 1234 [1938]; *Carolene Products Co. v. Wallace*, 27 F. Supp. 110 [1939]; *Setzer v. Mayo*, 150 Fla. 734, 9 So. 2d 280, 282 [1942]; *Carolene Products Co. v. Hanrahan, Com. Atty.*, 291 Ky. 417, 164 S. W. 2d 597 [1941].)

"5. The fact that a food product is wholesome does not of itself

make a prohibitory statute either inapplicable to the product or unconstitutional as applied to it." (*Carolene Products Co. v. Mohler,* 152 Kan. 2, 102 P. 2d 1044 [1940] ; *Powell v. Pennsylvania,* 127 U. S. 678, 684, 32 L. Ed. 253 [1888] ; *Hebe Co. v. Shaw,* 248 U. S. 297, 303, 63 L. Ed. 255 [1919] ; *Carolene Products Co. v. Wallace,* 27 F. Supp. 110 [1939] ; *Setzer v. Mayo,* 150 Fla. 734, 9 So. 2d 280 [1942] ; *Carolene Products Co. v. Hanrahan, Com. Atty.,* 291 Ky. 417, 421, 164 S. W. 2d 597 [1941] ; *Carolene Products Co. v. Harter,* 329 Pa. 49, 197 Atl. 627, 119 A. L. R. 235 [1938].)

"6. Whether the purposes of the statute may be attained by regulation or whether absolute prohibition is necessary are questions for the legislature." (*Powell v. Pennsylvania,* 127 U. S. 678, 32 L. Ed. 253 [1888] ; *U. S. v. Carolene Products Co.,* 304 U. S. 144, 154, 82 L. Ed. 1234 [1938] ; *Carolene Products Co. v. Wallace,* 27 F. Supp. 110, 111 [1939] ; *Setzer v. Mayo,* 150 Fla. 734, 9 So. 2d 280, 282 [1942] ; *Carolene Products Co., v. Hanrahan, Com. Atty.,* 291 Ky. 417, 425, 426, 164 S. W. 2d 597 [1941] ; *Carolene Products Co. v. Harter,* 329 Pa. 49, 197 Atl. 627, 119 A. L. R. 235 [1938].)

"7. It is not material that defendant's product was unknown when the statute was enacted." (*Hebe Co. v. Calvert,* 246 Fed. 711, 717 [1917].)

"8. Defendant's product is within the purview of the statute." (*Hebe Co. v. Shaw,* 248 U. S. 297, 63 L. Ed. 255 [1919] ; *Carolene Products Co. v. Hanrahan, Com. Atty.,* 291 Ky. 417, 164 S. W. 2d 597 [1941].)

"9. The legislature is not required to cover all evils of a like character in a single act. It may proceed step by step." (*State v. Nossaman,* 107 Kan. 715, 193 Pac. 347, [1920] ; *U. S. v. Carolene Products Co.,* 304 U. S. 144, 151, 82 L. Ed. 1234, [1938] ; *Carolene Products Co. v. Harter,* 329 Pa. 49, 56, 197 Atl. 627, 119 A. L. R. 235, [1938].)

"10. Whether other products and compounds come within the statute is not an issue in this case.·

"11. It is not material that defendant intends for its product to be sold for what it really is and without fraud or deception. Since the product is susceptible of being sold as and for evaporated milk, and is so sold, the legislature has the right in the exercise of the police power to prohibit its sale as an instrument of fraud." (*Carolene Products Co. v. Mohler,* 152 Kan. 2, 10, 102 P. 2d 1044 [1940] ;

*Hebe Co. v. Calvert,* 246 Fed. 711, 717 [1917]; *Carolene Products Co. v. Evaporated Milk Ass'n,* 93 F. 2d 202 [1937].)

"12. Tested by the foregoing principles, the statute, as applied to defendant's product, is constitutional and valid.

"13. Defendant The Sage Stores Company should be ousted from abusing its corporate franchises and privileges by selling Milnot and Carolene in violation of the statute.

"14. Judgment should be rendered against both defendants for the costs of this action."

Conclusion of law 10 is correct. In our view of the matter the charge of discriminatory enforcement was properly stricken from the answer. Mere failure to bring actions against others selling a product which, on the face of the statute, was barred, is no defense to the instant action. (*State, ex rel., v. Wheat Farming Co.,* 137 Kan. 697, 715, 22 P. 2d 1093, *Boynton v. Fox West Coast Theatres Corporation,* 60 F. 2d 851, 854, and see, also, *Buxbom v. City of Riverside,* 29 F. Supp. 3, 8, which distinguishes the noted case of *Yick Wo v. Hopkins,* 118 U. S. 356, 6 S. Ct. 1064, 30 L. Ed. 220, and similar cases.)

Defendant's contention the alleged discriminatory enforcement of the law denied to it the equal protection of the laws of this state and abridged the privileges and immunities of defendant as a *citizen* of the United States in violation of the first section of the fourteenth amendment to the federal constitution, is not good. A corporation does not possess the privileges and immunities of a citizen of the United States within the meaning of the federal constitution. (*Warehouse Co. v. Tobacco Growers,* 276 U. S. 71, 72 L. Ed. 473; *Blake v. McClung,* 172 U. S. 239, 43 L. Ed. 432; *Selover, Bates & Co. v. Walsh,* 226 U. S. 112, 57 L. Ed. 146.)

In this connection we may state also that during oral argument before this court on the subject of alleged discriminatory enforcement, defendant's counsel was reminded by the court that this was an original action in this court and that we could yet permit evidence to be introduced upon the subject. Defendant's counsel was asked whether it desired to have such permission granted and the reply was that counsel was not insisting upon it.

In its supplemental answer defendant alleged the statute consti-
·tuted the enactment of a special law where a general law could be made applicable and it, therefore, violated the state and federal constitutions. Under this contention defendant raises a question of

statutory construction. It argues if the statute be construed to permit the sale of powdered, or dried, skimmed milk which is fortified with fat or oil other than milk fat and, if the statute prohibits the sale of powdered whole milk which is fortified with fat or oil other than milk fat, the statute is unreasonable and arbitrary and violates the state and federal constitutions. Defendant's product is not a powdered whole milk or a powdered skimmed milk product and the question it raises is not properly an issue in this case and need not be determined. In any event the statute does not constitute special legislation insofar as defendant's product is concerned. The law is general and uniform as to each of the respective classifications of milk, whether they be liquid or powdered.

The classification of liquid and powdered products has a sound basis at least insofar as prevention of misrepresentation or fraud is concerned. The liquid product is made far more nearly in semblance, if not in imitation, of milk than the powdered product and thus lends itself more easily to being sold or purchased as milk. Touching a related discussion see *Carolene Products Co. v. Harter*, 329 Pa. 49, 56, 57, 197 Atl. 627.

Defendant raised the economic issue over plaintiff's objection. In its answer defendant alleged facts which it claimed constituted the manufacture and sale of its product a benefit rather than a detriment to the public. Those allegations need not be repeated. This being an original action and the court desiring not to exclude any testimony which might become material, overruled plaintiff's motion to strike allegations of the answer touching economic aspects of the case.

Defendant claims the evidence supports the averments contained in its answer and that the economic benefits resulting to the public from the sale of its product are particularly important in view of food shortages resulting from the war. Defendant contends the prohibition of its product cannot be sustained on economic grounds alone or as a trade barrier statute for the protection of the dairy industry, or any other trade group. We, however, do not understand that defendant contends the economic issue is controlling in the event the statute is held to be a valid health measure designed to protect the public against deception and fraud. We have held it to be such a measure in *Carolene Products Co. v. Mohler*, supra, and we adhere to that view now. The legislature, in the enactment of the law, had the right to weigh every factor germane to the sub-

ject of the public health, including economic considerations, and we cannot assume it did not do so.

Defendant earnestly argues its product was not known when the statute was enacted in 1923 and it could not have been the intention of the lawmakers to prohibit the sale of its product which is equal or superior to whole milk. We need not repeat what previously has been said relative to the comparative nutritive value of defendant's product and whole milk. In support of its contention that an act will not be literally construed when it appears the lawmakers could not reasonably have intended to prohibit the particular thing in question, defendant cites the noted case of *Holy Trinity Church v. United States,* 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226; *United States v. Aetna Explosives Co.,* 256 U. S. 402, 41 S. Ct. 513, 65 L. Ed. 1013; *Carolene Products Co. v. Mahoney,* 294 Fed. 902; and *In re Di Torio,* 8 F. 2d 279. In our opinion these cases are not controlling here. (See case cited under conclusion of law 7 and also *Carolene Products Co. v. Wallace,* 27 F. Supp. 110, 112, on the subject of fortification of milk with new vitamins.)

While it probably is true the legislature, when it enacted the statute, did not have knowledge of defendant's particular product, it is also true the product is clearly within the prohibition of the statute and that the question of its inferiority as compared with products containing milk fat remains a debatable question among scientists today. Under these circumstances we cannot say the product is not now within the terms of the statute.

In defendant's exhaustive brief are cited numerous cases which we do not deem it necessary to discuss separately. The important aspects of the case are treated in the authorities listed under the various conclusions of law previously stated. Defendant relies upon the following decisions involving wholesome and nutritious filled-milk products: *Carolene Products Co. v. Thomson,* 276 Mich. 172, 267 N. W. 608; *Carolene Products Co. v. Banning,* 131 Neb. 429, 268 N. W. 313; *John F. Jelke Co. v. Emery,* 193 Wis. 311, 214 N. W. 369, which in effect overruled *State, ex rel. Carnation M. P. Co., v. Emery,* 178 Wis. 147, 189 N. W. 564; *State, ex inf. McKittrick, v. Carolene Products Co.,* 346 Mo. 1049, 144 S. W. 2d 153; *Carolene Products Co. v. Mahoney,* 294 Fed. 902, and affirmance of the last case in *Mahoney et al. v. Carolene Products Co.,* 2 F. 2d 366.

Defendant relies also upon that portion of the majority opinion in *Setzer v. Mayo,* 150 Fla. 734, 9 S. 2d 280, 283, where it was said:

"In fine, food values and the place of vitamins in the food is a subject that is still open for added knowledge. Well recognized food concepts of yesterday are being discarded because of scientific discovery. If therefore relators can show that notwithstanding their product is produced by substituting cotton seed oil or some other substitute for butter fat and vitamins it is wholesome and nutritious and that it is equal to or superior to whole milk as a food, the test prescribed in the last two cited cases is met and their product relieved from condemnation by the act." (p. 283.)

The last two cases referred to in the above quotation were *U. S. v. Carolene Products Co.,* 304 U. S. 144, 58 S. Ct. 778, 82 L. Ed. 1234, and *Carolene Products Co. v. Wallace,* 27 F. Supp. 110, affirmed without opinion in 308 U. S. 506, 60 S. Ct. 113, 84 L. Ed. 433.

The above quotation is not very helpful to defendant in the instant case for the reason that under the evidence in this case it remains a doubtful or debatable question whether defendant's product is equal or superior to whole milk.

Defendant also leans heavily upon the decision in *Weaver v. Palmer Bros. Co.,* 270 U. S. 402, 46 S. Ct. 320, 70 L. Ed. 654, as authority for the principle that an act which completely prohibits and suppresses the sale of an article which is not injurious is invalid under the equal protection clause of the federal constitution for the reason that protection against possible deception in the sale of such an article or product may be accomplished by adequate regulation. In support of the same principle defendant relies upon the Michigan, Nebraska and the most recent Wisconsin case cited, all *supra* (filled-milk cases) and *People v. Weiner,* 271 Ill. 74, 78, 110 N. E. 870; *People v. Biesecker,* 169 N. Y. 53, 57, 58, 61 N. E. 990; *The People v. Marx,* 99 N. Y. 377, 2 N. E. 29; *Meyer v. Nebraska,* 262 U. S. 390, 43 S. Ct. 625, 67 L. Ed. 1042, and *Schollenberger v. Pennsylvania,* 171 U. S. 1, 18 S. Ct. 757, 43 L. Ed. 49, the oleomargarine case.

In support of defendant's contention that it is not responsible for the false representations of retail advertisers when defendant has done its legal duty to properly distinguish its product from whole milk or evaporated whole milk it cites *Rathbone, Sard & Co. v. Champion Steel Range Co.,* 189 Fed. 26, 37 L. R. A., n. s., 258 and *Carolene Products Co. v. Banning,* supra.

In support of defendant's contention that a statute valid when enacted may become invalid by reason of changed conditions it cites *Nashville, C. & St. L. Ry. Co. v. Walters,* 294 U. S. 405, 415, 55 S. Ct. 486, 488, 79 L. Ed. 949; *Abie State Bank v. Bryan,* 282 U. S. 765, 772, 51 S. Ct. 252, 75 L. Ed. 690; *Smith v. Illinois Bell*

*Tel. Co.*, 282 U. S. 133, 162, 51 S. Ct. 65, 75 L. Ed. 255; *Chastleton Corp. v. Sinclair*, 264 U. S. 543, 44 S. Ct. 405, 68 L. Ed. 841; *Shallenberger v. First State Bank*, 219 U. S. 114, 31 S. Ct. 189, 55 L. Ed. 117.

In our view of this case it will serve no useful purpose to extend this opinion by a discussion of the conflict, or apparent conflict, of authorities. We think the decision in this case is governed by the authorities cited in support of the conclusions of law previously stated. Those authorities, especially the later ones, treat the subject of conflict in the decisions. In quite a number of the cases the sharp conflict of authority is disclosed by dissenting opinions or by specially concurring opinions and what is there said need not be repeated here.

While in this opinion we have referred to defendants in the singular, the principles of law stated, of course, govern both defendants.

The writ is allowed, but in conformity with finding 56, ouster of the defendant, The Sage Stores Company, is hereby limited and restricted to the extent of enjoining it from selling or keeping for sale the product of the defendant, Carolene Products Company, whether sold or kept for sale under the trade name of Carolene and Milnot or under any other fictitious or trade name.

Judgment is hereby rendered against both defendants for. the costs of the action.

WEDELL, J. (dissenting): The principal issues in this lawsuit are (1) the construction of the particular statute in question with a view of determining whether it constitutes a *reasonable* health measure, and (2) whether courts, for all practical purposes, are powerless to prevent the complete suppression of a legitimate business in an article of food which is not injurious and which, on the contrary, is not only wholesome but nutritious and which by reason of its low cost and superior preservative qualities is in great demand, especially by people in the lower income groups.

No progress can be made in answering these inquiries by dealing in generalities and platitudes relative to the subjects of "public health," "morals" or "general welfare." Manifestly, the first inquiry requires analysis of the sweeping terms and provisions of this particular statute. Its specific terms and provisions were not analyzed and construed by this court in *Carolene Products Co. v. Mohler*, 152 Kan. 2, 102 P. 2d 1044, with a view of determining whether it in fact constituted a *reasonable* health measure. Without

making such analysis, which we were then, as now, asked to make, we merely announced the conclusion that the purpose of the statute was to safeguard the public health and to prevent deception upon the citizen. In my opinion that was not a sound conclusion. On the contrary, I am convinced analysis of the statute clearly discloses it is a trade-barrier law and that it was designed primarily to advance the interests of the dairy industry.

If the statute was intended to be a health measure it must be a *reasonable* health measure. Does it constitute such a measure? I do not think so. I further believe courts have the ultimate responsibility and duty to determine whether an act constitutes such a measure or whether it is unreasonable, arbitrary and discriminatory.

In the first place this is not an adulteration act. The subject of adulteration of foods is covered by other statutes. The great variance in the nutritive character of milk is clearly established by the evidence in this case and is also a matter of common knowledge. Its nutritive value depends upon the cow itself, the food and care it receives, the season of the year and probably some other factors. This law fixes no standard of minimum nutritive value for whole milk. Milk which is permitted to be sold may be wholly inferior in nutritive value to the product the statute condemns. The law in nowise prohibits the subtraction of any of the nutritive ingredients from whole milk. It only prohibits the addition of something. The addition which it condemns is *any* fat or oil other than a fat or oil which belongs distinctly and solely to the dairy industry. Under the clear and unambiguous provisions of this law it is wholly immaterial whether any other fat or oil which might be added is equal or highly superior in nutritive value to milk fat. Irrespective of its value it is flatly condemned by legislative fiat.

In this record it is conceded that whole milk alone is not a perfect food. Yet under this law milk may not be improved and perfected as a food of universal consumption for the benefit of the public health by adding any fat or oil unless it be a fat belonging peculiarly and exclusively to the dairy industry. Under this law skimmed milk which has its milk fat removed nevertheless may be sold to the public with vitamins A and D absent therefrom, but if those fat solubles, vitamins A and D, are added to skimmed milk in even greater and more constant quantities than are contained in whole milk itself, as is done in the instant case, the product is flatly

condemned. I cannot bring myself to believe the primary purpose of such a law was the preservation of the public health. If, however, that was its purpose, the law clearly is not a reasonable health measure. It is unreasonable, arbitrary and discriminatory.

The supreme courts of Michigan, Nebraska and Missouri, which have construed identical and substantially identical statutes, have condemned them as constituting unreasonable health measures notwithstanding the prominence of the dairy industries in those states. (*Carolene Products Co. v. Thomson*, 276 Mich. 172, 267 N. W. 608, *Carolene Products Co. v. Banning*, 131 Neb. 429, 268 N. W. 313; *State, ex inf. McKittrick, v. Carolene Products Co.*, 346 Mo. 1049, 144 S. W. 2d 153.)

The Michigan and Nebraska courts have devoted particular attention to the construction of the statute. They concluded the statute was clearly unreasonable as a health measure and constituted a barrier to trade. The analysis of the statute made by each of those courts is clear and convincing. What is said there need not be repeated here. That analysis, in my opinion, is unimpeachable and stands unanswered by subsequent opinions of any court. Those decisions were not noticed in our former opinion in *Carolene Products Co. v. Mohler*, supra, and their clear logic has not been disturbed in any manner by the later opinions of such other courts as have cited them. It will be well to notice that they are cited in the specially concurring opinion of Mr. Justice Butler in *U. S. v. Carolene Products Co.*, 304 U. S. 144, 58 S. Ct. 778, 82 L. Ed. 1234, which opinion will be mentioned later.

Why should such a law which completely suppresses a legitimate business and which also deprives the public, especially the citizens in the lower income brackets, of the advantages of scientific discovery and research be upheld as a sound public health measure? The answer certainly cannot be found in the character of the prohibited product. The principle that courts do not determine economic policies of legislation or its wisdom is elementary and requires no citation of authorities. Those are functions of the legislative branch of government with which courts cannot interfere. It is just as elementary, however, that in order for legislation such as this to be valid under the police power of the state, it cannot be arbitrary or discriminatory but must have a real and substantial relation to the objects sought to be attained. Courts are not powerless to determine the character of such legislation. The construction

of statutes and the determination of their reasonableness or unreasonableness is the ultimate province, responsibility and duty of courts and must be exercised by them if state and federal constitutional guaranties of liberty and property rights are not to be made completely subservient to legislative pressure groups which all too frequently secure the enactment of measures advantageous to a particular industry and detrimental to another. The preservation of constitutional guaranties against such invasions and encroachments is one of the most sacred responsibilities courts are privileged to exercise.

Are the decisions of the supreme court of the United States contrary to what has been said herein on the subject of the construction of the Kansas law as constituting an unreasonable health measure? I do not think so. Nor do I so interpret the late Florida decision in the case of *Setzer v. Mayo*, 150 Fla. 734, 9 S. 2d 280, 282 (1942) leaned upon so heavily by the state. It was clearly recognized and stated in the Florida opinion that its statute contained definite exceptions not contained in the Kansas law and that the Florida law was not nearly as direct and comprehensive as the Kansas law. The question in the Florida case was whether the product fell within the exceptions of the Florida statute. The majority opinion in the Florida case, as expressly stated therein, was planted squarely on the doctrine laid down in *U. S. v. Carolene Products Co.*, 304 U. S. 144, 58 S. Ct. 778, 82 L. Ed. 1234, and *Carolene Products Co. v. Wallace*, 27 F. Supp. 110. The federal statute was involved in those cases and that statute expressly provides:

"Section 62. . . . It is hereby declared that filled milk, as herein defined, is an adulterated article of food, injurious to the public health, and its sale constitutes a fraud upon the public."

In the concurring opinion of Mr. Justice Butler in *U. S. v. Carolene Products Co.*, supra, the issue in the prosecution of the above statute was concisely stated as follows:

"I concur in the result. Prima facie the facts alleged in the indictment are sufficient to constitute a violation of the statute. But they are not sufficient conclusively to establish guilt of the accused. At the trial it may introduce evidence to show that the declaration of the act that the described product is injurious to public health and that the sale of it is a fraud upon the public are without any substantial foundation. *Mobile, J. & K. C. R. Co. v. Turnipseed*, 219 U. S. 35, 43, [55 L. Ed. 78, 80, 31 S. Ct. 136, 32 L. R. A., n. s., 226, Ann. Cas. 1912A, 463, 2 N. C. C. A. 243]; *Manley v. Georgia*, 279 U. S. 1, 6, [73 L. Ed. 575, 578, 49 S. Ct. 215]. . . . If construed to exclude from interstate commerce wholesome food products that demonstrably are neither injurious to

health nor calculated to deceive, they are repugnant to the Fifth Amendment. *Weaver v. Palmer Bros. Co.*, 270 U. S. 402, 412, 413, [70 L. Ed. 654, 657, 46 S. Ct. 320]. See *People v. Carolene Products Co.*, 345 Ill. 166, [177 N. E. 698]; *Carolene Products Co. v. McLaughlin*, 365. Ill. 62, 5 N. E. 2d 447; *Carolene Products Co. v. Thompson*, 276 Mich. 172, 267 N. W. 608; *Carolene Products Co. v. Banning*, 131 Neb. 429, 268 N. W. 313. The allegation of the indictment that Milnut 'is an adulterated article of food, injurious to the public health,' tenders an issue of fact to be determined upon evidence." (p. 155.)

The Florida court in interpreting that decision, and resting its own decision thereon, in substance said that if this product (the cottonseed oil product involved in the instant case) was *equal or superior* to whole milk in nutritive value, the product was not within the condemnation of the act. The Kansas statute, however, as previously shown, clearly is not open to such an interpretation. It arbitrarily suppresses, completely bans a legitimate business irrespective of the nutritive value of the product involved. to which oil or fat, other than milk fat, has been added, and irrespective of whether it is honestly made, labeled and sold for exactly what it is. In other words, our statute completely bans the sale of any such product even though the public is not injured by its use and is in no way deceived by what it buys. The only possible remaining basis for the law is therefore the mere possibility that the sale of the product is susceptible to fraud. If the law was intended as a health measure it must be based upon the theory of such possibility of fraud. To meet that possibility the lawmakers chose to adopt the drastic remedy of prohibiting the sale of the product entirely. The same unreasonable prohibition was at one time applied to the sale of oleomargarine. (*Powell v. Pennsylvania*, 127 U. S. 678, 8 S. Ct. 1257, 32 L. Ed. 253, [1888].) But in 1898 the Supreme Court of the United States did not leave the final decision as to the reasonableness of such drastic legislation in the discretion of the lawmaking body. (*Schollenberger v. Pennsylvania*, 171 U. S. 1, 18 S. Ct. 757, 43 L. Ed. 49.) Every argument advanced by the state in the instant case was advanced by the state in the last cited oleomargarine case (see pages 7 and 8 of that opinion), but it was there determined:

"2. The fact that inspection or analysis of the article imported is somewhat difficult and burdensome will not justify a state in totally excluding a pure and healthy food product.

"3. A state cannot absolutely prohibit the introduction within its borders of an article of commerce which is not adulterated, and which in its pure state is healthful, simply because such article in

the course of its manufacture may be adulterated by dishonest manufacturers, for the purpose of fraud or illegal gains." (43 L. Ed. headnotes 2, 3.)

In the course of the same opinion it was further pointedly stated: "The bad article may be prohibited, but not the pure and healthful one."

The drastic remedy of complete suppression of a healthful food product will receive further attention presently. What previously has been said relates primarily to the construction of the statute itself without regard to any particular product. For the purpose of dealing with the principle involved and its realistic implications it is wholly unnecessary to review in detail the voluminous record pertaining to the exact character of all the ingredients of the instant product. (See findings of commissioner 1 to 11, inclusive.) Observation of a few general facts will suffice. Every constituent element of the instant food compound is wholesome and nutritious in its natural state and that condition is in nowise altered in the process of manufacture or shipment in the original package. In some respects the product is clearly superior to whole milk or evaporated whole milk. Viewed in its entirety it is considered by numerous physicians, dietitians, pediatricians and nutritionists as superior to whole milk or evaporated whole milk and is also considered by them to be superior to the special baby food products as a diet for infants. It is actually preferred to whole milk by many housewives who know its character and contents. It has far greater resistance to rancidity than whole milk. It is well known that whole milk cannot long be stored. Milk is an excellent medium for growth of bacteria. The product in question is more practical and especially desired by the great mass of consumers in the lower income groups who are not blessed with modern refrigeration facilities. It is much cheaper than whole milk with the result that its nutritive value is available to people who are unable to buy and preserve the more expensive product, whole milk. It frankly should be stated that there is some disagreement among the experts relative to its nutritive value as compared with whole milk. Some of them prefer whole milk. They believe that considered in its entirety whole milk contains greater nutritive value and growth promoting qualities than this product. But if there is any field of scientific research and discovery in which the experts agree as to every fact and detail, that field is foreign to the observation and experience of most of

us. In view of the entire record it is my opinion that it definitely may be stated this product is not injurious but on the contrary is wholesome and nutritious. The only difference of opinion pertains to the extent of its nutritive value as compared with whole milk. In other words, a question of comparative nutritive value is presented.

Shall this law be upheld upon the principle that the legislature has the power and authority to select for the individual citizen what food he shall eat and drink because in the judgment of that body, supported by some creditable testimony, one kind or brand of food or drink is slightly superior in some respects to another food or drink although the latter is admittedly superior in other respects? If the legislature possesses the power to determine that fact as to one food, it manifestly has the same power with respect to every food. Such power would enable the legislature to ban many common articles of commerce as, for example, syrup not all maple, shoes not all leather (*Carolene Products Co. v. Thomson*, supra), clothes or comfortables with shoddy in them (*Weaver v. Palmer Bros. Co.*, 270 U. S. 402, 46 S. Ct. 320, 70 L. Ed. 654) and the like.

It is indeed doubtful whether there is any brand of food concerning which there is no disagreement as to its nutritive value when compared with other similar foods. If the power of the legislature to prohibit the sale of a product may be based upon a difference of opinion as to the comparative nutritive value of various food products then the legislature has the power to impair as well as conserve the market for dairy products. (*Carolene Products Co. v. Thomson*, 276 Mich. 172, 183, 267 N. W. 608.) If the legislative power rests upon such a basis then, under the evidence in the instant case, it undoubtedly has the power to completely suppress the dairy industry by prohibiting the sale of milk altogether as there is an abundance of evidence in this record, which would support the judgment of any legislature, that the instant product is equal or superior to whole milk. (On the subject of such legislative power, see 35 Michigan Law Review, 982, 989.)

The instant record concedes that milk alone is deficient as a diet but certainly that fact should not justify the complete suppression of its sale. Certainly its sale is susceptible to deception. It is common knowledge that there is probably as much, if not more, deception in the sale of milk and cream by means of dilution than in the sale of any other single food product of universal consumption. The dairy industry, however, has not been suppressed. On the con-

trary, it often has been regulated in the minutest details and in most instances properly so. Owing to its important relation to the public welfare it has been regulated even to the extent of fixing the price of milk. (*Nebbia v. New York*, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940.)

What reasonable basis is there for believing the public cannot be protected adequately by regulation of the sale of this product? The state, in substance, insists the legislature is the judge of the reasonableness of its own acts and that if there exists any basis for completely prohibiting the sale of a healthful product, which seems reasonable to that body, courts are powerless to interfere. If a mere difference of opinion as to the comparative nutritive value of foods constitutes a reasonable basis for permitting the sale of one food and prohibiting the sale of another, courts have little, if any, practical function left to perform in protecting the constitutional guaranty of a citizen's right to engage in a legitimate business. Among others, the state cites the case of *State, ex rel. Carnation M. P. Co., v. Emery*, 178 Wis. 147, 189 N. W. 564, in which the Wisconsin court, in holding a similar act constitutional, in part, said: "The court cannot try the legislature and reverse its decision as to the facts." (p. 160.)

Certainly courts do not try the good faith of the law-making body but they have a definite duty to review the record and to consider every pertinent factor known to them in determining whether legislation actually rests upon a reasonable basis. That is precisely what the Wisconsin court did, with a contrary result, in the later case of *John F. Jelke Co. v. Emery*, 193 Wis. 311, 214 N. W. 369, in which it clearly did not approve the effect of its earlier decision in the first Emery case, *supra*. In the last decided case it clearly exercised its own constitutional authority and power to determine whether legislation which outlawed a wholesome, nutritious article of food actually rested upon a reasonable basis. In striking down the oleomargarine statute in the later case, it said:

"It prohibits the carrying on of a legitimate, profitable industry and the sale of a healthful, nutritious food. This prohibition can only be justified upon the ground that it is necessary in order to protect the public health, public morals, public safety, prevent fraud, or promote the public welfare. As already indicated, the public health is not endangered by the manufacture and sale of oleomargarine, and certainly no question of morals is involved . . . Under the facts proven in this case, whatever the economics of the

situation may be, from the standpoint of constitutional right the legislature has no more power to prohibit the manufacture and sale of oleomargarine in aid of the dairy industry than it would have to prohibit the raising of sheep in aid of the beef-cattle industry or to prohibit the manufacture and sale of cement for the benefit of the lumber industry. In some cases a proper exercise of the police power results in advantage to a particular class of citizens and to the disadvantage of others. When that is the principal purpose of the measure, courts will look behind even the declared intent of legislatures, and relieve citizens against oppressive acts where the primary purpose is not to the protection of the public health, safety, or morals. *Yick Wo v. Hopkins*, 118 U. S. 356, 6 Sup. Ct. 1064, 30 Lawy. Ed. 220, and cases cited in notes, p. 541." (pp. 318, 323.)

Of course, the legislature has the *primary* responsibility of determining the reasonableness of its acts. It, however, is not the sole and final judge of the reasonableness of its own acts. The *ultimate* power to determine whether legislation creates unreasonable, arbitrary and discriminatory classifications rests with the courts. (*Carolene Products Co. v. Thomson*, 276 Mich. 172, 267 N. W. 608; *Carolene Products Co. v. Banning*, 131 Neb. 429, 268 N. W. 313.) But whatever the rule may be in some states, in this state courts are now expressly charged with that responsibility and duty by constitutional mandate. (Art. 2, sec. 17.) This is not a general law which, for the protection of the public, prescribes a minimum standard of nutritive value for milk and a substitute product. It creates a special classification of foods which is unreasonable, arbitrary and discriminatory. This court cannot evade its responsibility upon the mere theory there is some possibility for deception in the sale of a healthful food product. It must determine whether there exists a reasonable basis for making the classification and for adopting the drastic remedy of complete prohibition. In obedience to constitutional direction this court repeatedly has exercised its power and duty to strike down legislation covering various and sundry subjects *when in its opinion* the legislature did not have a reasonable basis for a classification it created. (*State, ex rel., v. Allen County Comm'rs*, 156 Kan. 248, 133 P. 2d 165, and cases cited therein.) These decisions constitute only a few of the numerous instances in which this court has exercised that function.

"The measure of police power must square with the measure of public necessity." (*Brooks v. United States*, 267 U. S. 432, 45 S. Ct. 345, 346, 69 L. Ed. 699, 37 A. L. R. 1407; *Carolene Products Co.*

*v. Evaporated Milk Ass'n,* 93 F. 2d 202, 204.) "Constitutional guaranties may not be made to yield to mere convenience." (*Schlesinger v. Wisconsin,* 270 U. S. 230, 46 S. Ct. 260, 43 A. L. R. 1224, 70 L. Ed. 557; *Carolene Products Co. v. Thomson,* supra.)

It may be simpler and more convenient for the state to arbitrarily stifle a legitimate business enterprise than to regulate it, but mere convenience to the state, as noted, is not the test. There is, in my opinion, no sound basis for the classification of foods made by our statute and there is no reasonable ground for the view that the public cannot be protected adequately by regulation of the sale of this healthful food product. Were the instant product injurious, a far different question would be presented. Nothing has been added to give this product an artificial taste or color, or to give it a resemblance to any other food or food product. (Finding 33.) It is not advertised by its producer for any use to which it properly cannot be put. The only possible basis for the exercise of the police power here is that the public should be advised that the product is not whole milk. The only reason for so advising the public is not that the product is injurious, but because there is some difference of opinion relative to its nutritive value as compared with whole milk.

The labels employed by defendant since our previous decision have been submitted to and approved by the Federal Food and Drug Administration. The present label in clear and conspicuous fashion frankly states the product is—"Not evaporated milk or cream." The label accurately and truthfully discloses the exact constituents of the product. It is not claimed the product is adulterated or that defendant has violated any advertising or misbranding law of this state. If, however, the state is of the opinion larger and yet more conspicuous labels are necessary, it may require them. The state, of course, may, under its regulatory powers, prescribe any requirement for the protection of the public so long as it is reasonably designed to protect the public health and general welfare.

It is common knowledge that any food product or article of commerce is subject to misrepresentation. Manifestly, however, defendant should not be and is not made responsible for tricky or unfair advertisements by retailers. In *Carolene Products Co. v. Banning,* supra, it was aptly said:

"If retailers of a wholesome and nutritious food product practice deception in its sale, the remedy is by regulation and not by a destruction of the business." (p. 437.) (See, also, *Rathbone, Sard &*

*Co. v. Champion Steel Range Co.*, 189 Fed. 26, 37 L. R. A., n. s., 258, and note 84 A. L. R. 488 b.)

It is conceded defendant encloses in the cases of its product a notice advising its dealers that—"It is improper to advertise, represent, display or sell either of these products as milk, evaporated milk or cream." If the state deems these precautionary measures insufficient, it may require retailers to place the product on separate shelves with conspicuous signs which read: "This is not milk." The state may make it a crime for retailers to sell the product without calling the contents of the label to the attention of the purchaser. Such, or other similar, requirements as may suggest themselves to the state are indeed simple in comparison with numerous other regulations and requirements made upon the citizen and businessman in these days under penalty of fine and imprisonment. Moreover, such regulations present minor problems of enforcement in comparison with the minute and detailed rules and requirements now imposed upon various kinds of business and industry under numerous regulatory measures.

There is no similar food product on the market except the proprietary infant foods. The record discloses no administrative difficulty in ascertaining the contents of the product. The testimony discloses a competent food chemist can readily determine whether a fat in a product is butterfat or vegetable oil and whether a vegetable oil or fat is coconut oil or a hydrogenated oil of other sources. It is not difficult for a competent food chemist to analyze defendant's product and to determine whether its constituents are as stated on the label. The defendant company has such assays made from time to time by competent disinterested chemists and copies of such reports are made available to any state authorities. Like assays are made by the Federal Food and Drug Administration of foods which move in interstate commerce. (Finding 49.)

My views are well stated in *Carolene Products Co. v. Thomson*, supra, as follows:

"It seems incontrovertible that any possibility of fraud, sufficient in extent to be called public, in the sale of a harmless and nutritive food product may be avoided by regulations as to branding, disclosure of ingredients, kinds and marking of containers, requirement that eating places give notice to customers of its use as is already provided for oleomargarine, 1 Comp. Laws 1929, § 5374, and otherwise. Stringent, even onerous, regulations to protect milk are valid.

"Regulations of various sorts have been found adequate for the protection of the public in the sale of other milk products. There has been no attempt,

by testimony or argument, to indicate that they would not be effective in the vending of Carolene and, in view of the fact that both of the elements of the product are lawful objects of sale in the State, only their union is prohibited and the completed product is harmless, the remedy necessary to avoid infringement upon constitutional rights is by way of regulation, not prohibition. *Weaver v. Palmer,* supra. Of course, if the product were harmful, the police power to prohibit would be greater." (pp. 181, 182.)

To the same effect is *Carolene Products Co. v. Banning,* supra, in which the Nebraska court emphasized the fact that if the legislature has the power to suppress the sale of Carolene, a healthful food product, it has the same power to prohibit the sale of any article on the market, as all are subject to the possibility of being misrepresented.

When the rights of the citizen come in conflict with actual public welfare, the rights of the former must, of course, yield. Manifestly that is fundamental and sound doctrine. I am, however, unwilling to see constitutional guaranties of the citizen's right to engage in a legitimate business whittled away when there is no reasonable basis for believing that the public welfare probably could not be protected adequately by regulation of the business. It is not only important that the constitutional guaranty to the citizen to transact a legitimate business should be zealously protected by the courts. It is also most vital that the public should not be deprived of its right to purchase a desirable and healthful article of food which scientific research and discovery have made available to the public at a low cost and in a form easily preserved by the citizen in the lower income groups who is not blessed with refrigeration facilities. The sale of such an article may be in competition with another industry but, under proper regulation, it cannot reasonably be said to be in conflict with the public interest and welfare.

SMITH and HOCH, JJ., join in the foregoing dissent.

### COMMISSIONER'S REPORT

(The commissioner's conclusions of law appear in the body of the opinion.)

The commissioner's findings of fact are:

"(The first 11 Findings are taken and adopted from the 'Stipulation of Undisputed Facts.')

"(Unless otherwise indicated, references to the defendant mean defendant Carolene Products Company.)

"(1) That J. S. Parker is the duly elected, qualified and acting Attorney General of the State of Kansas, and brings this action on behalf of plaintiff, for and on behalf of the State of Kansas.

"(2) The Sage Stores Company is a corporation organized under the laws of Kansas, doing business in the State of Kansas, with its principal place of business at Topeka, Kansas; that it is engaged in the general mercantile, produce and retail grocery business and that as such, at the time of the filing of said petition in this case, was keeping for sale, and having in its possession with intent to sell and was selling the product hereinafter described, manufactured for and distributed by the Carolene Products Company, known as Milnot and Carolene.

"(3) That Carolene Products Company is a Michigan corporation organized for the purpose of engaging in the distribution and sale of the food product hereinafter described, known as Milnot and Carolene.

"(4) That Carolene and Milnot, the only products sold by this defendant in Kansas, are identical except for trade names; that Carolene and Milnot will be referred to hereinafter as defendant's product.

"(5) That defendant Carolene Products Company has not shipped into the State of Kansas or sold in the State of Kansas any product containing coconut oil or bearing the label criticized by this Court since the final decision and judgment of this Court in the case of *Carolene Products Company v. J. C. Mohler et al.,* Number 34307. That neither at the time of the institution of this suit nor at any time thereafter has the defendant The Sage Stores Company possessed or sold any of the product containing coconut oil heretofore manufactured by Carolene Products Company; and neither has said defendant The Sage Stores Company sold any of the product of the defendant Carolene Products Company bearing the label criticized by this Court since the final decision and judgment of this Court in the case of *Carolene Products Company v. J. C. Mohler et al.,* No. 34307.

"(6) That the sole ingredients of defendant's said product are sweet skim milk, refined cottonseed oil and natural vitamin concentrates; that there is no other ingredient in defendant's product except the foregoing; that defendant's product is manufactured in the modern, sanitary creameries of the Litchfield Creamery Company at Litchfield, Illinois, and at Warsaw, Indiana; that defendant's prod-

uct is manufactured by mixing (a) sweet skim milk, (b) refined cottonseed oil and (c) natural vitamin A and vitamin D concentrates, and thereafter evaporated at the Litchfield Creamery Company with sanitary equipment in the same manner as sweet, whole or skim milk is evaporated in the manufacture of evaporated milk; that after evaporation, at the end of which the volume of the mixture is reduced to 40 percent of the original volume solely from loss of water, the product is put up in hermetically sealed cans by modern and sanitary canning machinery; that after the canning, the cans and the product therein are thoroughly sterilized under steam pressure at 240° F. in the same manner as canned evaporated whole milk is sterilized; that defendant's product is rendered thereby absolutely free of all bacteria and so remains thereafter.

"(7) That each 14½ ounce can of defendant's product contains 2,000 U. S. P. units of vitamin A and 400 U. S. P. units of vitamin D.

"(8) That the fat soluble vitamins A and D, introduced in defendant's product are secured from nationally known, reputable laboratories which have extracted these vitamins from prime natural sources such as fish livers and prepared these concentrates of readily available vitamins for use in human food and for medical purposes.

"(9) The defendant's product is a compound containing approximately the following chemical constituents:

| | |
|---|---|
| Fat, approximately | 6.00% |
| Protein, approximately | 7.75% |
| Carbohydrates, approximately | 10.75% |
| Mineral salts, approximately | 1.65% |
| Water, approximately | 73.85% |

"(10) That the uniform label used on defendant's product is as follows: (The commissioner's report referred to the page of the abstract containing pictures of the labels and the following description has been filled in by the court.)"

The labels on the cans in which the product is contained are identical except that one product is labeled Milnot and the other Carolene. These names appear in large bold type toward the top of the respective labels. Just above the name of the product appear the words—13 Fluid Ozs.—14½ Ozs. Net Wt. Immediately under the word, Milnot, or Carolene, appear the words, in prominent type—"It Whips." Between the name of the product and the words, "It Whips," appear the words, "Reg. U. S. Pat. Off." Immediately under the above description appear in bold type the words, "Not

Evaporated Milk or Cream." Immediately to the left of the center and lower part of the label appear the words—"A compound of evaporated skimmed milk, cottonseed oil, vitamins A & D." Immediately to the right of the center and lower part of the label appear the words—"Contains not less than 2,000 U. S. P. Units vitamin A (from fish-liver oil) and 400 U. S. P. Units vitamin D (Activated ergosterol)."

Farther to the left of the center of the label above described appears the following:

All American Product

A high grade wholesome food product especially prepared for use in coffee, baking and for other culinary purposes.

Costs so little, that even the moderate budget can provide frozen desserts and whipped toppings.

Contains not less than 26 percent solids

Fat, approximately ................................ 6.00%
Protein, approximately ............................ 7.75%
Carbohydrates, approximately ...................... 10.75%
Mineral salts, approximately ...................... 1.65%

Patents Pending

To the right of the center description previously noted appear pictures of three types of food and to the right of the pictures, the following:

For better flavor and more inviting appearance, serve Whipped Milnot with all desserts.

Whipped Milnot in your favorite recipes, or added to prepared mixes, makes smooth frozen desserts. Chill thoroughly before whipping.

Use Milnot, diluted with an equal amount of water, as a healthful, appetizing ingredient in all cooking and baking.

At the bottom of the entire label are the words—Manufactured for Carolene Products Co., Litchfield, Illinois, U. S. A. Copyright 1940, Carolene Products Co.

"(11) That Milnot and Carolene is a compound, manufactured and compounded from the following natural substances in their natural states: (a) skim milk, (b) refined cottonseed oil, and (c) natural concentrates of vitamins A and D; that in the compounding of these natural products no other substance is added.

"That all persons handling and dealing in said product, from the manufacturer to the retailer, carefully compound, sell and handle

this product in hermetically sealed tins bearing labels as heretofore exhibited.

"(12) As the name implies, cottonseed oil is a product of the cotton seed. The oil is extracted from the seed by a crushing and pressing process. The crude cottonseed oil so obtained is refined with caustic soda, after which, it is bleached, usually with Fuller's Earth, and put through a process of destearinization (removal of the natural stearins). It is then hydrogenated (the addition of hydrogen to the unsaturated portion of fat) and deodorized, resulting in a colorless, tasteless product, called 'hydrogenated cottonseed oil.' It is this hydrogenated cottonseed oil which is used in the manufacture of defendant's product.

"Hydrogenated cottonseed oil is used extensively for edible purposes, such as in shortening, oleomargarine and salad oils and dressings.

"In a bulletin published by the Nutrition Service of the Child Hygiene Division of the Kansas State Board of Health, it is stated:

" 'Margarine, lard, salt pork, bacon squares and vegetable fats and oils are all suitable fats to add to the diet. Some of the margarines have been reinforced with added vitamins.'

"Cottonseed oil is a wholesome, nutritious and harmless food, and there is no history of injury resulting from the use of cottonseed oil as a food for human consumption.

"(13) The statutory definition of skimmed milk is 'such milk as has had all or a portion of the butterfat removed.'

"According to reports published by the United States Department of Agriculture in 1939, 'almost fifty billion pounds of skim milk are fed to animals or destroyed every year,' and 'only about 12 percent of all the skim milk produced in the United States during the five-year period 1930-'34 was used in the manufacture of dairy products.' The experts who have testified in this case and the authorities generally agree that skim milk contains from one-half to two-thirds of the caloric value of whole milk.

"In the bulletin published by the Nutrition Service of the Child Hygiene Division of the Kansas State Board of Health, it is stated:

" 'Skim milk is a food of good value. The lack of cream should be compensated for by using extra butter, cod-liver oil and green, yellow and leafy vegetables. Buttermilk has the same food value as skim milk.

" 'Powdered skim milk has practically the same food value as fresh skim milk. One pound of milk powder, and a half pound of butter equals in value five quarts of whole milk. . . .'

"There is wide-spread malnutrition in the United States, including Kansas, and health authorities and nutritionists in general agree that it is desirable and in the interests of public health that more skim milk be used in the human dietary as an addition to our national milk supply instead of being fed to animals, used in the manufacture of plastics or wasted. Practically all of the skim milk available for the purpose, principally in powdered form, is now being sent to Britain for human consumption.

"Both dried and condensed skim milk are now in general use by bakers in the manufacture of bread and other bakery products, and it is used extensively in cooking, in the manufacture of ice cream and other dairy products.

"Skim milk is a wholesome, nutritious and harmless food, and there is no history of injury resulting from its use as a food for human consumption.

"(14) Vitamins are chemical compounds, found in a great variety of food stuffs, which are essential to life and the maintenance of good health. An adequate supply of the essential vitamins can be obtained by consuming a varied diet. The problem of insuring an adequate supply of vitamins has become more difficult in recent years because of modern refining and processing of food products. For example, the public demands white flour, which can only be obtained by removing the outer layers of wheat and the interior of the wheat kernel, which parts carry practically all of the vitamins found in wheat. It has therefore become a proper and accepted practice to fortify certain types of food, such as flour, margarines, chocolate syrup, chocolate bars and malted milk, by the addition of vitamin concentrates.

"(15) Cod-liver oil has been used for medicinal purposes for centuries. It was used to cure and prevent rickets as early as the eighteen-eighties. It was not until about 1913, however, that it was discovered that cod liver oil contains two factors now known as Vitamins A and D. It was not then possible to fortify food with cod liver oil because of its objectionable taste and odor. About 1930 it was discovered that halibut liver oil has a much greater potency of Vitamins A and D than cod liver oil, so that a dose of from 1 to 2 percent as much halibut liver oil as cod liver oil contains the same amount of these vitamins. Other species of fish are also excellent sources of Vitamins A and D. Oil is extracted from the livers of such fish, and by a process of refining is made suitable for use in

food and pharmaceutical products. By mixing the oil from two or more species, the desired potency of vitamins A and D is obtained.

"(16) Vitamins A and D obtained from fish livers in the manner above described are called natural vitamins and are what are used in the fortification of defendant's product. Natural vitamins are equal in nutrition to vitamins supplied through butter fat or other sources, and the fortification of foods with natural vitamins, including Vitamins A and D, is recognized by nutritionists as a proper practice.

"The bulletin published by the Nutrition Service of the Child Hygiene Division of the Kansas State Board of Health referred to above, has this to say about cod-liver oil:

'Cod-liver oil supplies vitamins needed for development of strong bones and teeth. Pregnant and nursing mothers may need this food. Infants, pre-school children, and school children may need it, too. All standard cod-liver oil is marked with the letters, U. S. P., which insures that it contains at least eighty-five units of vitamin D per gram. A teaspoonful makes about three grams. Cod-liver oil is a good source of vitamin A, which may be lacking in the diet unless a large amount of whole milk, eggs, and leafy vegetables are used. Cod-liver oil should be taken as prescribed by the family physician.'

"There is no history of injury resulting from the fortification of food with natural vitamins.

"(17) The word 'wholesome,' as used in the field of nutrition and in these Findings, means a food or nutrient which can be used by the body, is nontoxic and is useful as a food. 'Nutritious' means containing food value and 'nutritive value' is a term used to indicate the kind and quantity of nutrients contained in a food. The fact that a food is wholesome and nutritious does not mean that it is of itself an adequate or a complete food. A food may be both wholesome and nutritious, and yet be incapable of sustaining human life for a very long period. Disease can be caused by what the diet does not contain, as well as by what it does contain. For example, pellagra, which is rather common in some of the southern states, is caused by long continued partially inadequate diet.

"(18) The following is a tabulation of the known vitamins, showing their common name, chemical name, the disease associated with the deficiency of each and for what each is necessary:

## Tabulation of Known Vitamins

| Common name | Chemical name | Disease associated with deficiency of Fat Soluble Vitamins | Necessary for |
|---|---|---|---|
| Vitamin A Carotene may be converted to vitamin A in body | Vitamin A | Ophthalmia night blindness | Normal vision, resistance to infection, normal skin and lining of internal tissue |
| Vitamin D | Calciferol | Rickets | Normal utilization of calcium and phosphorus, strong bones |
| Vitamin E | Alpha-Tocopherol | Sterility, muscular dystrophy | Reproduction, cell division, muscle vigor |

Choline in the form of phospholipid is fat-soluble, see below for function.

| Common name | Chemical name | Disease associated with deficiency of Fat Soluble Vitamins | Necessary for |
|---|---|---|---|
| Vitamin K | Napthoquinones | Hemorrhagic disease Faulty blood clotting | Normal functioning of liver to allow blood clotting |
| | | *Water Soluble Vitamins* | |
| Vitamin C | Ascorbic acid | Scurvy | Normal blood vessels, healing of wounds |
| Vitamin $B_1$ | Thiamin | Beri-beri, faulty carbohydrate utilization | Normal production of energy from carbohydrates |
| Vitamin $B_2$, G | Riboflavin | Cheilosis | Normal skin, nerve and eyes |
| Niacin | Nicotinic acid | Pellagra | Normal oxidation in tissues |
| Vitamin $B_6$ | Pyridoxine | Dermatitis and anemia | Not definitely known |
| Pantothenic acid | Calcium pantothenate | Dermatitis | May function in preventing gray hair |
| Choline | Choline Chloride | Fatty liver, hemorrhagic kidney | Normal, phospholipid formation |
| Biotin | Biotin | Spectacled eye, paralysis | Unknown |
| Inositol | Inositol | Loss of hair | Unknown |

| Para-amino-benzoic acid | Same | Gray hair | Unknown |

Recognized but not characterized
Grass juice factor
Folic acid
Factors R and S
Factor U
Eluate Factor
Milk growth factor for guinea pigs
Vitamin M for monkeys

"This tabulation also separates the vitamins into the fat soluble and water soluble groups. Upon the separation of cream from milk the fat soluble vitamins go with the cream and the water soluble vitamins remain in the skim milk.

"Of the fat soluble vitamins listed in the tabulation, vitamins A, D and K are undoubtedly essential in human nutrition. The experts are not agreed on vitamin E, and it is at least doubtful if this vitamin is essential in the diet of infants.

"Of the water soluble vitamins shown in the tabulation, vitamins C, $B_1$, $B_2$ or G, Niacin, $B_6$, pantothenic acid and choline are important in human nutrition. The function of the remaining water soluble vitamins is still unknown.

"(19) All known vitamins are present in whole cow's milk, but neither whole cow's milk nor any other single food is an adequate source of all the vitamins. Whole cow's milk comes closer than any other food to supplying the necessary vitamins for human life. The vitamin content of whole milk varies widely according to the cow, the season and the type of food fed to the cow. The vitamin A content of ordinary evaporated milk varies from 1,000 to 2,500 units per 14½ ounce can, and the vitamin D content is about 35 units, The vitamin K content is small.

"(20) Milk is not a perfect food for human beings. It is deficient in iron, copper and manganese, and in vitamin D. It is more complete than any other food, and cow's milk is the best known substitute for breast milk for the human infant. Pediatrists do not advise its use, however, as the sole diet of infants without modification or the addition of other substances. In the bulletin 'Infant Care' issued by the United States Department of Labor, offered in evidence by the plaintiff, it is advised that cod-liver oil be added to the whole milk diet of an artificially fed baby after it is two weeks old.

"(21) Approximately four percent of the milk produced in the United States goes into evaporated milk. The sale of evaporated milk doubled in the fifteen years ending 1938, and since then the percentage of increase has been somewhat larger.

"(22) The 'Organization of the Evaporated Milk Industry under the Agricultural Adjustment Administration' sends to its members price bulletins showing the prices paid for 3.5 percent raw milk at evaporated milk plants in the North Central states. The same organization sends to its members a schedule of 'minimum prices to be paid for raw milk according to the formula provided in the evaporated milk license made effective by the Secretary of Agriculture June 1, 1935.' The formula, in general, provides for a minimum price for milk testing 3.5 percent butterfat of its combined butter value (average wholesale price 92 score butter at Chicago) and cheese value (average wholesale prevailing price of 'Twins' on Wisconsin cheese exchange) plus 30 percent. Litchfield Creamery Company has consistently paid more than such average price, the percentage by which the price paid by it exceeded the average price fluctuating from year to year from a low of 4.71 percent at the Warsaw plant in 1938 to a high of 12.72 percent at the Warsaw plant in 1939. The operations of Litchfield Creamery Company have contributed substantially to the expansion and prosperity of the dairy industry in the vicinity of its plants.

"(23) Litchfield Creamery Company purchases annually from approximately 4,800 farmers and dairymen in the vicinity of its two plants the milk produced by 30,000 cows. In 1940, it paid for the whole milk so purchased $2,068,483.62. It also purchased a small quantity of skimmed milk for which, in 1940, it paid $57,078.09. In 1940, it manufactured over 1,100,000 cases of Milnot and 5,368,-000 pounds of butter which it sold for $1,609,121.42. Its daily intake of whole milk in 1940 was 300,000 pounds, as compared to 50,000 pounds in 1934.

"(24) The dairy industry is one of the most important in this state. As of April 1, 1940, there were 156,327 farms in Kansas, containing 48,173,635 acres, and of the total value of $1,421,387,464. Seventy-six percent of these farms, or 129,213, produced milk in 1939. In 1940, 57.8 percent or more of the income from 11,545 farms came from dairying, and 8,400,000 acres of farm land were required for dairying. As of January 1, 1942, there were 786,000 cows and heifers two years old and older kept for milk production

purposes in the state, and there were 484,548 people living on farms and partly dependent on the income from dairying. In 1941, there were in the state 1,670 cream stations, 268 cream brokerages and 396 creameries, ice cream manufacturers and pastuerizing plants, 35 cheese factories and 10 condenseries, which employed an estimated 2,500 people. An estimated 6,000 people are engaged in producing and distributing milk; 3,700 are engaged in buying cream and milk for resale. In 1940, Kansas produced 3,030,000,000 pounds of milk of a total value of $40,905,000. The butter production in 1940 was 73,806,166 pounds. The 8,400,000 acres of land devoted to dairying and the buildings thereon are worth $247,800,000; the dairy cows and heifers are worth $57,378,000; the manufacturing plants represent an investment of $10,000,000; and the cream stations and brokerages an investment of $500,000; or a total investment in the dairy industry of $315,678,000.

"(25) The quality of milk and dairy products is directly influenced by the economic condition of the dairy industry for the reason that, when milk cannot be produced and sold profitably, there is a tendency for dairymen not to keep their equipment in first-class condition, and not to feed the dairy cows an adequate supply of the proper foodstuffs.

"A sound economy for the dairy farmer is therefore essential for the production of an adequate supply of pure, wholesome milk.

"(26) Undoubtedly the operations of the Litchfield Creamery Company have been of economic benefit and advantage to the dairy farmers in the vicinity of its two plants. It appears, however, that it is the only concern now engaged in the manufacture of filled milk. The patent on the process used has expired, and there is nothing to prevent other evaporated milk manufacturers from engaging in the business of manufacturing and selling filled milk if such business is legal. The business is a profitable one, and the evaporated milk companies will enter the field if and when filled milk can legally be manufactured and sold. While the operations of Litchfield Creamery Company have tended to increase the income of the dairy farmers in the vicinity of its two plants, it does not follow that the income of dairymen generally will be increased if the business of manufacturing and selling filled milk is engaged in on a competitive basis and on a nation-wide scale.

"Filled milk is made principally from skim milk, that is, milk from which the butterfat has been removed. The butterfat so re-

moved is replaced in filled milk by a vegetable oil, and the butterfat is thrown on the market for sale in some other dairy product such as butter. Since the price of milk is largely governed by the butter market, it necessarily follows that the free and unrestricted manufacture of filled milk would decrease the price paid for whole milk. The sale of filled milk would reduce the demand for evaporated whole milk, which would also exercise a depressing influence on the price paid for whole milk.

"(27) A product made of skim milk and coconut oil was sold under the name of 'Carolene' as early as 1917. The name 'Milnut' was first used in 1934. Shortly after the present product, which contains cottonseed oil instead of coconut oil, was placed on the market, the trade name 'Milnut' was changed to 'Milnot,' but the wholesalers and grocers used up their stocks on hand bearing the 'Milnut' label and defendant's cottonseed oil product was still being sold under the name 'Milnut' in Kansas at the time this suit was filed and was identical with the product now sold under the trade name 'Milnot.' Defendant's product is now being sold under the trade names 'Carolene' and 'Milnot' in eighteen states.

"After the decision of this court in *Carolene Products Company v. Mohler*, 152 Kan. 2, a new label for use on the cottonseed oil product was prepared and submitted to the Federal Food and Drug Administration. Such label was revised to meet all objections and suggestions made by the federal administrator, and is the label now in use (Finding 10).

"(28) Defendant's product is packed in cases containing either 48—14½ ounce cans or 96—6 ounce cans. The cans are the same size and the number of cans per case are the same as are used in packing and shipping evaporated whole milk.

"(29) Defendant sells its product in the State of Kansas only to wholesalers through food brokers, who also handle other food products. Defendant makes no shipments to retailers or consumers. The broker obtains an order for defendant's product from a wholesale grocer, and submits it to defendant for acceptance or rejection. If defendant accepts the order, the product is shipped to the wholesaler in unbroken packages by rail or truck from Litchfield, Illinois. Defendant collects from the wholesaler and pays the food broker his commission. The broker has nothing to do with making delivery of the product to the wholesaler. The wholesaler distributes the product in the original packages to the retail grocer, and the latter

442

breaks the packages and sells to the consumer by the can. The wholesalers, on their own initiative, and at their own expense, have advertised the product in Kansas to some extent over the radio, and there has been newspaper advertising of the product in Kansas by both wholesalers and retailers. Defendant has sales agents and representatives who call upon the brokers and wholesalers in Kansas in furtherance of its business.

"(30) Since this suit was filed defendant has endeavored to protect the market for its product in the state of Kansas. During said time, the State Board of Agriculture has notified wholesalers and retailers handling defendant's product, both by letter and through its inspectors, that the sale of said product was in violation of the statute. In several instances, the retailers so notified have advised the wholesaler from whom they purchased the product of having received such notice, and the wholesaler or the food broker, or both, brought the matter to the attention of defendant, and it, in a number of instances, has written letters from its principal office in Litchfield, Illinois, to retailers in Kansas, to the effect that the constitutionality of the law is being tested by a case now pending in Kansas, and that it is continuing the sale of its product during the pendency of the litigation, and that it does not feel that there will be any prosecution of retailers for selling the product during the pendency of the litigation, but that 'if they should arrest you, or any other retailer, for selling our product, Milnot, we will pay all costs of such litigation, provided you plead not guilty and give us an opportunity to defend you in the case.' In instances where prosecutions have been instituted against retailers for selling defendant's product, attorneys employed and paid by defendant have appeared and defended such retailers. Some of the retailers so notified have discontinued the sale of defendant's product, but some have continued to sell it.

"(31) During the years 1940 and 1941, a deputy dairy commissioner called on a number of retail grocers in the state for the purpose of investigating the sale of defendant's product. The deputy's method of approach was to ask a clerk for cheap canned milk. Many of the 28 stores visited which were selling defendant's product displayed it with or near evaporated milk. In some of the stores the clerk first recommended defendant's product, and in several instances the clerk either first recommended some brand of evaporated milk or some brand of evaporated milk and defendant's product.

Many of the clerks either informed the deputy of the nature of the product or read to him from the label, but a majority did not disclose the nature of the product.

"During the same period, three other deputies made surveys in their territory to see how the product was being displayed. In most instances, it was displayed on shelves with or near evaporated milk.

"(32) Most of the housewives who use defendant's product know, at least in a general way, what it is. The evidence indicates, however, that some do not. In a majority of cases, housewives call for the product under its trade name, but some call for it as 'Milnot Milk,' and some of the retail grocers who testified in this case so referred to it.

"(33) Nothing is added to defendant's product to give it an artificial taste or color, or to give it a resemblance to any other food or food product. Since the principal constituent of the product is skim milk, and the refined, hydrogenated cottonseed oil which is added is odorless, tasteless and colorless, the product necessarily closely resembles evaporated whole milk in taste, consistency, odor and appearance. The average consumer could not distinguish between them by taste, smell or appearance. .

"(34) Various retail grocers have advertised defendant's product in their local newspapers on their own initiative and at their own expense. The following are statements which have appeared in such newspaper advertisements:

  " 'Milnot, So Rich it Whips,
   10 Tall Cans—59c'
   'Milk—Milnut, It Whips—Per Can 5c'
   'Milnut. Use it Like Evaporated Milk
   in Coffee or in Cooking. 3 Tall Cans 19c'
   'Milnut, So Rich it Whips, Tall Can 5c'
   'Milk—Caroline Brand
   4 Tall Cans 23c'
   'Milk, Milnut—It Whips
   3 cans—17c'
   'Carnation Milk—3 Tall Cans—20c
   Milnut—4 Tall Cans—25c'
   'Millnut Milk—Large Cans
   4 for 25c'
   'Millnut Canned Milk, Large Can 6c'
   'Milk—Carolene 4 Lge. Cans 25c;
   12 Cans 69c'

"There is nothing in the record to indicate that defendant knew of or in any way authorized or encouraged this form of advertising. To the contrary, defendant puts in the cases of its product a 'Notice,' in which it is stated, among other things, that 'It is improper to advertise, represent, display or sell either of these products as milk, or evaporated milk or cream.'

"(35) At the time the evidence relating thereto was taken, wholesalers in Kansas were paying $3.10 per case for defendant's product and selling to retailers for $3.50 per case. At the same time the wholesaler was buying Carnation evaporated milk for $3.72 per case and selling to the retailer for $3.87 per case, and was buying Page's evaporated milk for $3.57 per case and selling it for $3.77. The average retail selling price of defendant's product is approximately one cent per can less than that of evaporated whole milk.

"(36) Defendant furnishes its food brokers in Kansas with printed recipe books, which the food broker distributes to the retailers. These books contain 60 recipes, in all of which defendant's product is used as an ingredient instead of milk or cream. Some of the titles of the recipes are: Boston Cream Pie, Cream Pie, Strawberry Ice Cream and Creamy Fudge. On the back of the book appears the statement that 'Milnut can be used for all culinary purposes wherever you now use whole milk, cream, whipping cream, or a canned milk.'

"(37) The openings in fat molecules have the ability to absorb oxygen, and such absorption of oxygen forms a compound with a rancid odor. In hydrogenated cottonseed oil these openings in the fat molecules have been closed so that oxygen cannot enter, and hydrogenated cottonseed oil therefore withstands the development of rancidity to a greater degree than butterfat, and hydrogenation has greatly widened the field for the use of cottonseed oil.

"(38) Defendant's product is used principally by families in the low income group. It is used as a substitute for milk and cream and has no other use. It has had good customer acceptance. The evidence clearly shows that the housewives who have used it prefer it to evaporated whole milk. Among the reasons given for such preference are that it has a better taste than evaporated milk; that it will whip and so can be used as a substitute for whipping cream; that it is cheaper and that it will keep longer (as heretofore found, hydrogenated cottonseed oil has a greater resistance to rancidity than butterfat), than evaporated whole milk, which is important to families who lack refrigeration facilities.

"(39) A study of the nutritional status of the school children of the state made under the supervision of the State Board of Health indicates that approximately 25 percent of the school children suffer from malnutrition. The principal deficiency is in food rich in nutrients. The principal reasons for the nutritional deficiency are: lack of adequate income with which to purchase proper foods; lack of information as to what are the proper foods; and lack of interest. The Extension Service of Kansas State College and the Nutrition Service of the State Board of Health are carrying on educational programs for the purpose of teaching housewives the best foods to buy with the amount of money available. The workers for these Services oppose the sale of defendant's product on the ground that it is not an adequate substitute for whole milk, and should not be sold unless the housewives who use it are taught the necessity of using other foods to supply the nutrients present in whole milk but not in defendant's product.

"(40) There are several baby foods on the market, such as S. M. A., a concentrated liquid derived from cow's milk, the fat of which is replaced by animal and vegetable fat, including codliver oil; Olac, a dried mixture of skim milk containing olive oil and halibut liver oil; Sobee, which contains soybean flour; and Mull-Soy, which also contains soybean flour. While there is no law prohibiting the sale of these products by grocers (assuming that they do not come under the statute under consideration), they are ordinarily sold by druggists and are ordinarily fed to babies only on the advice and under the directions of a physician. They are usually sold in powdered form, and do not resemble defendant's product or evaporated milk in packaging, color or consistency. Such preparations are ordinarily fed only to sick babies who cannot tolerate whole cow's milk. Pediatrists usually attempt to get such infants back on a whole milk formula as soon as possible.

"(41) All fats, both animal and vegetable, are composed of three elements—hydrogen, oxygen and carbon. The combination of these elements determines the character of the fat.

"Practically all natural fats, animal and vegetable, including both butterfat and cottonseed oil, are tri-glycerides (three fatty acids attached to each glycerin molecule). No other fat approaches butterfat in the number and assortment of fatty acids, of which it contains nineteen. Cottonseed oil contains six fatty acids.

"(43) Both parties have submitted tables comparing the chemical

composition of evaporated milk and defendant's product. (Plaintiff's appears as Exhibit 'LL,' page 1848 of the transcript, defendants' commencing on page 56 of their 'Statement, Brief and Argument.') Both tables are illustrative, but neither is exactly accurate. The fact is that no complete, accurate analysis of the same sample of milk or butterfat has ever been made. Many different analyses have been made for different purposes from different samples at different times, and the composite of these analyses is not an accurate analysis of the whole by reason of the wide variation in the samples analyzed. Neither has any complete analysis been made of defendant's product. Further, as will hereafter appear, the experts who testified, and the authorities cited, are not in agreement as to the composition of either evaporated whole milk or defendant's product. Under these circumstances, no accurate comparison of the chemical composition of evaporated whole milk and defendant's product is possible.

"(44) Phospholipins are not true fats, but are similar to fats, and are necessary in human nutrition. They are utilized in building body tissue, particularly nerve sheaths.

"Whole milk contains phospholipins. There is testimony in the record that 'most of the *phospholins* will stay in the skimmed milk.' There is equally positive testimony to the effect that 'practically all of the phospholipins accompany the butterfat phase. They are removed from the skimmed milk.'

"(45) Sterols are solid alcohols which are essential in human nutrition. Sterols are found in whole milk, and upon separation of the cream from the milk largely go with the cream. Sterols are also present in cottonseed oil, and are therefore present in defendant's product. There is testimony, however, that plant sterols are not absorbed by the body as readily as animal sterols.

"(46) As has been found, Vitamin E is fat soluble. One of the authorities states that 'Refined and hydrogenated cottonseed oil are also excellent sources of the vitamin (E). Cottonseed oil is as satisfactory as wheat germ oil for the preparation of concentrates (of Vitamin E).' To the contrary, another authority states that 'The vegetable fats as a rule contain but small quantities of fat soluble Vitamins A, D and E. After refining and deodorization, they are usually devoid of vitamins.' One of the witnesses testified that Vitamin E is removed with the cream and would not be replaced in defendant's product by the addition of cottonseed oil.

"(47) There is testimony in the record to the effect that the human is capable of manufacturing the fat soluble Vitamin K in the intestinal tract; that it has a water soluble phase as well as the fat soluble phase; that if there is any Vitamin K in whole milk, the quantity is so small as to be immeasurable. On the other hand, there is testimony that milk contains a sufficient amount of Vitamin K to prevent hemorrhagic disease in young infants.

"(48) Not all of the vitamins which are necessary in human nutrition have been identified. Numerous attempts have been made to rear various types of animals on diets containing no vitamins except those which have been identified. All such attempts have failed.

"The human being may obtain an adequate supply of these essential but unknown vitamins by consuming a varied diet of natural foodstuffs.

"(49) The Babcock test is by statute a standard test in Kansas for the purpose of determining the percent of butterfat in milk and cream. This test would not show whether the fat in a product such as Milnot was butterfat or a vegetable oil. There are other tests, however, by which a competent food chemist can readily determine whether a fat in a product is butterfat or vegetable oil, and by which they can readily determine whether a vegetable oil or fat is coconut oil or a hydrogenated oil of other sources. It would not be difficult for a competent food chemist to analyze defendant's product for the purpose of determining whether its constituents are as stated in the label. Carolene Products Company has such assays made from time to time by a competent disinterested chemist, and copies of such reports are made available to any state authorities. Like assays are made by the Federal Food and Drug Administration of foods which move in interstate commerce.

"(50) Biochemists have been largely responsible for the developments in the field of nutrition. Their experiments are performed with animals which can be sacrificed. The biochemist feeds his test animals the food or product under consideration and observes and studies the results. A physician concerned with the health of his patient, and interested in the patient's recovery, obviously cannot give his patient a new and untried diet. Information obtained by the biochemist from his experiments on animals is passed on to the physician, and the latter incorporates it in his treatment of human beings. An outstanding example was the discovery by Doctor

Elvehjem (who testified in this case) of the fact that nicotinic acid was active in curing black tongue in dogs, and physicians immediately applied this knowledge to the treatment of pellagra. Not all of the results obtained by animal experimentation are applicable to human beings, but they cannot safely be ignored. A pediatrist would proceed very slowly and cautiously in feeding to a baby food which had proved to be unsatisfactory in the diet of animals.

"(51) Distinguished scientists in the field of biochemistry testified in this case. From rat experiments conducted by them, plaintiff's witnesses were of the opinion that rats fed on butterfat made better and more efficient gains during the first two or three weeks on the experiment than rats fed vegetable oils homogenized into skim milk, and that rats 'did much poorer' on the vegetable oil diet than the rats on the butterfat diet. It was their conclusion from such experiments that butterfat contains a superior growth-promoting property, as compared to the vegetable oils, probably a long chain saturated fatty acid (or acids) present in butterfat in small amounts, and not present in certain vegetable oils, including cottonseed oil.

"One of the biochemists who testified for defendants was of the opinion, based on rat experiments conducted by him, that the nutritive value of evaporated milk and defendant's product is equal. The others were critical of the rat experiments conducted by plaintiff's witnesses, and disagreed with the conclusions drawn therefrom.

"Another scientist, who testified for the plaintiff, had conducted experiments on calves for the purpose of finding a substitute for butterfat in the diet of young calves. He testified that in average gain in weight, as well as in general well being, 'the calves fed butterfat excelled those in all other groups,' which included a group fed cottonseed oil.

"(52) In general, the testimony of defendants' witnesses was to the effect that the product in question is a wholesome, nutritious, useful and harmless food for human consumption, including adults, children and infants. Many of such witnesses prefer the product to evaporated whole milk, principally on account of its more constant and adequate content of Vitamins A and D. Some of the physicians who testified have used such product in the diet of infants under their care, and prefer it to evaporated whole milk or the special purpose infant foods.

"In general, plaintiff's witnesses are of the opinion that the animal experiments have shown that filled milk is inferior to evaporated

whole milk in the diet of animals; that 'there is a difference between vegetable oils and butterfat which can be demonstrated on animals'; that the substitution of vegetable oil for butterfat in the diet of infants and children should not be allowed 'until there has been a large human experience with babies'; and that if filled milk gets into the channels of infant nutrition, it should be prohibited.

"(53) The expert witnesses who testified in this case include chemists, biochemists, physiologists, professors in medical school, public health authorities and physicians specializing in pediatrics and nutrition. They are among the most eminent men in America in their fields. Their ability and integrity are not open to question.

"In the foregoing findings, some of the respects in which such experts disagree have been pointed out for the reason that (under the view the commissioner takes of the law) the fact that the experts do so disagree is itself a material fact. Such differences of opinion are due in part to the recognized human tendency to draw different conclusions from the same facts and in part to the fact that the experts were testifying on subjects concerning which the store of knowledge is still far from complete. New discoveries are constantly being made. At the time the evidence was being taken, an important rat experiment was being conducted on a larger scale than any heretofore attempted.

"The case, however, must be determined in the light of present-day knowledge, as shown by the evidence introduced.

"Defendant's product is wholesome, nutritious and harmless, in the sense that it contains nothing of a toxic nature, but it is inferior to evaporated whole milk in the content of fatty acids, phospholipins, sterols and Vitamins E and K, all of which are essential in human nutrition, with the probable exception of Vitamin E in the diet of infants. In addition, evaporated whole milk contains a superior growth-promoting property, found in butterfat and not in cottonseed oil, essential to the optimum growth of infants.

"These deficiencies in defendant's product, as compared to evaporated whole milk, are largely made up from other sources when the product is used as a substitute for whole milk or evaporated whole milk in the diet of adults who consume a varied diet. When defendant's product is used as a substitute for whole milk or evaporated whole milk in the diet of infants and children who do not consume a varied diet, such deficiencies are not made up, and the

diet is partially inadequate. Defendant's product does 'get into the channels of infant nutrition.'

"(54) Plaintiff has requested a finding of fact to the effect that the evidence does not show any intentional or arbitrary discrimination against defendant's product in the manner in which the statute has been enforced.

"The defense of intentional and arbitrary discrimination in the enforcement of the statute was expressly pleaded by defendants in their answers, and was stricken therefrom by the court on motion of the plaintiff. Defendants were therefore not permitted to introduce evidence in support of this plea.

"Under these circumstances, it would not be proper to make a finding on the subject of discriminatory enforcement.

"(55) The defense of arbitrary and unreasonable discrimination in the statute itself stands on a different footing. This defense was raised by defendants in supplemental answers filed with the consent of the court after the introduction of evidence had been concluded. In allowing the filing of such supplemental answers, the court authorized the commissioner in his discretion to hear additional evidence pertinent to such defense. Both parties advised the commissioner, in response to his inquiry, that they did not care to introduce additional evidence. It is therefore proper to make a finding on this defense, which is an issue under the pleadings as now framed.

"The evidence does not show any intentional or arbitrary discrimination against defendant's product in the express terms of the statute.

"(56) No evidence was offered for the purpose of showing that defendant The Sage Stores Company has violated the law in any particular except as charged in this case, and the State announced that if the findings and judgment are in its favor, it will be satisfied with a limited ouster as to The Sage Stores Company."