CAROLENE PRODUCTS CO. v. EVAPO-
RATED MILK ASS'N et al.
No. 6283.

Circuit Court of Appeals, Seventh Circuit.
Dec. 2, 1937.

Rehearing Denied Jan. 7, 1938.

George N. Murdock, of Chicago, Ill., for appellant.

Sidley, McPherson, Austin & Burgess, of Chicago, Ill. (George O. Tiffany, Donald F. McPherson, and Howard Neitzert, all of Chicago, Ill., of counsel), for appellees.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Plaintiff appeals from a decree dismissing its bill of complaint, in which it sought a writ of injunction against defendants, restraining them from conspiring to defeat the interstate trade and commerce of plaintiff, in violation of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq.

Plaintiff is engaged in the manufacture and shipment in interstate commerce of filled milk, that is, skimmed milk with which has been mixed coconut oil, the mixture then being evaporated. The court found and the plaintiff admits that its interstate commerce in this article is in direct violation of the United States Filled Milk Act, 21 U.S.C.A. 61 to 63 inclusive. In view of this admission, it is apparent that the appeal must fail if the act is constitutional, for it is well established that equity will not aid one who comes into court as a law violator; that it is not within the legitimate province of a court of equity to grant relief to an admitted wrongdoer. Creath v. Sims, 5 How., 46 U.S. 192, 12 L.Ed. 111; American Banana Company v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826, 16 Ann.Cas. 1047; Beck v. Flournoy Live-Stock & Real-Estate Co., 8 Cir., 65 F. 30; Modern Horse Shoe Club v. Stewart, 242 Mo. 421, 146 S.W. 1157. Consequently the essential question presented is the constitutionality of the act.

Section 2 of the act, passed in 1923, 21 U.S.C.A. § 62, contains this language: "It is declared that filled milk, as herein defined, is an adulterated article of food, injurious to the public health, and its sale constitutes a fraud upon the public. It shall be unlawful for any person to manufacture within any Territory or possession, or within the District of Columbia, or to ship or deliver for shipment in interstate or foreign commerce, any filled milk." After declaring that the term "person" shall include a corporation, the law further, section 1 of the act, 21 U.S.C.A. § 61, provides that "the term 'filled milk' means any milk, cream, or skimmed milk, whether or not condensed, evaporated, concentrated, powdered, dried, or desiccated, to which has been added, or which has been blended or compounded with, any fat or oil other than milk fat, so that the resulting product is in imitation or semblance of milk, cream or skimmed milk, whether or not condensed, evapo-

rated, concentrated, powdered, dried, or desiccated."

Plaintiff contends that, inasmuch as its product is a wholesome food, the law is unconstitutional, and such was the ruling of Judge FitzHenry and Judge Adair in the District Court upon indictments in that court, the reasoning being that Congress is without constitutional power to prohibit interstate commerce of an article containing no deleterious substances. The Supreme Court of Illinois, in People v. Carolene Products Co., 345 Ill. 166, 177 N.E. 698, held a state law aimed at commerce in such articles unconstitutional. Various courts have disagreed in their interpretation of similar laws, some of them holding such laws constitutional [1] and others holding them void. [2]

■ The scope of the constitutional authority of Congress over interstate commerce is defined in McDermott v. Wisconsin, 228 U.S. 115, 33 S.Ct. 431, 433, 57 L.Ed. 754, 47 L.R.A., N.S., 984, Ann.Cas. 1915A, 39, as follows: "[Congress] has the right not only to pass laws which shall regulate legitimate commerce among the states and with foreign nations, but has full power to keep the channels of such commerce free from the transportation of illicit or harmful articles, to make such as are injurious to the public health outlaws of such commerce, and to bar them from the facilities and privileges thereof." While the police power is ordinarily said to be reserved by the states, it is obvious that it extends fully likewise to the federal government in so far as that government acts within its constitutional jurisdiction and that, more specifically, the exercise of police power is within the authority of Congress in the protection of interstate commerce. Thus in Hoke v. United States, 227 U.S. 308, 33 S.Ct. 281, 284, 57 L.Ed. 523, 43 L.R.A., N.S., 906, Ann.Cas. 1913E, 905, the court observed that the power of Congress over transportation among the several states is complete in itself; that that body may adopt any means convenient to its exercise; and that "the means may have the quality of police regulations." See, also, Clark Distilling Co. v. Western Maryland Railway Co., 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326, L.R.A.1917B, 1218, Ann.Cas.1917B, 845; Lottery Case, 188 U.S. 321, 23 S. Ct. 321, 47 L.Ed. 492; Seven Cases v. United States, 239 U.S. 510, 36 S.Ct. 190, 60 L.Ed. 411, L.R.A.1916D, 164, and Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas.1917B, 1168. As Mr. Chief Justice Taft said in Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 346, 69 L.Ed. 699, 37 A.L.R. 1407: "Congress can certainly regulate interstate commerce to the extent of forbidding and punishing the use of such commerce as an agency to promote immorality, dishonesty or the spread of any evil or harm to the people of other states from the state of origin. In doing this it is merely exercising the police power, for the benefit of the public, within the field of interstate commerce." The police power referred to "extends to all the great public needs. * * * It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare." Noble State Bank v. Haskell, 219 U.S. 104, 31 S.Ct. 186, 55 L.Ed. 112, 32 L.R.A., N.S., 1062, Ann.Cas. 1912A, 487. Its "dimensions are identical with the dimensions of the government's duty to protect and promote the public welfare. The measure of police power must square with the measure of public necessity." It is beyond question, therefore, that the enactment of the law was within the power of Congress unless it is unreasonable and arbitrary.

■ We may not inquire into the motives of Congress, Hamilton v. Kentucky Distilleries Co., 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194 or, in the absence of doubt as to its reasonableness, the wisdom of legislation or the necessity for the exercise of legislative power, the existence of which is beyond doubt, Lottery Case, supra. Thus, in Price v. Illinois, 238 U.S. 446, 35 S.Ct. 892, 59 L.Ed. 1400, the court held that the contention of the

---

[1] State ex rel. Carnation Milk Prod. Co. v. Emery, 178 Wis. 147, 189 N.W. 564; Carolene Products Company v. Harter, Pa. C. Com. Pleas, March, 1937; Hebe Co. v. Calvert, D. C., 246 F. 711; Hebe Co. v. Shaw, 248 U.S. 297, 39 S.Ct. 125, 63 L.Ed. 255; Seven Cases v. U. S., 239 U.S. 510, 36 S.Ct. 190, 60 L.Ed. 411.

[2] Carolene Products Co. v. Thomson, 276 Mich. 172, 267 N.W. 608; Carolene Products Co. v. Banning, 131 Neb. 429, 268 N.W. 313; Carolene Products Co. v. McLaughlin, 365 Ill. 62, 5 N.E.2d 447; People v. Carolene Products Co., 345 Ill. 166, 177 N.E. 698.

plaintiff in error that the law was arbitrary and unreasonable, and therefore void, can be sustained only if it appears that by a consensus of opinion the article is unquestionably harmless with respect to its contemplated uses, that is, that it is necessary to classify it indubitably as a wholesome article of commerce, innocuous in its designed use and unrelated in any way to any possible danger to the ·public health. Then and then only will any act prohibiting it constitute an arbitrary interference with the property and liberty of the citizen. It is plainly not enough that the question should be regarded as debatable; for if it is doubtful, the Legislature is entitled to its own judgment—a judgment not to be superseded by verdict of a jury or decision of a court. Price v. Illinois, 238 Ill. 446, 35 S.Ct. 892, 59 L.Ed. 1400. See Hebe Co. v. Shaw, 248 U.S. 297, 39 S.Ct. 125, 63 L.Ed. 255; Gant v. Oklahoma City, 289 U.S. 98, 53 S.Ct. 530, 77 L.Ed. 1058; Rast v. Van Deman & Lewis, 240 U.S. 342, 36 S.Ct. 370, 60 L.Ed. 679, L.R.A.1917A, 421, Ann.Cas.1917B, 455; Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229.

That the Congress had reliable information before it supporting the wisdom of the proposed legislation appears from the reports of its committees. Those bodies found and reported certain facts: The mixture of skimmed milk and oil is an exact imitation of pure condensed or evaporated milk; it has the same consistency, color and taste; the difference in the two products can be detected only by an expert or by chemical analysis; the compound can be made more cheaply than the regular article, and in view of the fact that the imitation is perfect, many people buy it in the belief that they are getting full condensed or evaporated milk; manufacturers do not label it as milk but it is put up in the same sized cans as regular condensed milk and is advertised by the retail dealers as milk and evaporated milk. Storekeepers sell it with the statements that "it takes the place of milk," "is just as good as condensed milk and much cheaper"; that there is "nothing better on the market" and "takes the place of condensed milk." Instances were reported in which coconut fat had been mixed with milk and sold as cream and others in which the compound had been used in making ice cream. The article is sold largely in sections inhabited by people unable to read English and of limited means, and scarcely at all in the more enlightened districts. As a consequence, the label is of little or no protection to the purchasing public, in advising them that the product they buy is a mixture of milk and vegetable oils.

The scientists before the committees pointed out that milk is a food for which there is no effective substitute and upon which we have depended for generations; that the valued Vitamin A of milk occurs in no vegetable oil; that an infant fed for a few weeks on a milk substitute, such as here involved, will develop rickets, scurvy, serious eye diseases; beriberi; that even tuberculosis may be traced to the lack of the vitamins of milk in the diet; and that the chief source of such in milk is the butter fat which is removed from filled milk. Experts testified that, when rats were fed over a given period of time on identical rations except that in one pure milk was used and in the other filled milk, those fed on the first diet grew in a natural way, whereas those fed on the second grew to but half the size, developed bodily deformities contracted a fatal eye disease, and died within sixty days after the experiment began. The witnesses asserted that a nursing mother who does not receive sufficient Vitamin A in her diet supplied only by milk cannot transmit healthful milk to her offspring.

The evidence included reports from various authentic sources to the effect that butter fat possesses a biological function which cannot be supplied by any vegetable oil in combination with skimmed milk; that growth of the human ·body and the quality of children's teeth and their health depend largely upon milk in the diet; and that "there is no evidence of any satisfactory substitute but every evidence against the substitution of cheap vegetable fat."

Both committees found that constant confusion between the two articles exists; that dangerous consequences follow the sale of filled milk, not because it is deleterious in itself, but because people accept it as milk and as a result receive none of the vitamins which make of milk the most desirable food we have. They recommended that the traffic in filled milk should be "stopped now, before irreparable injury is done to the health of the Nation."

Thus, it is evident that before it acted Congress conducted an extensive investigation, considered the facts both pro

and con as to the wisdom of the proposed legislation, and concluded that an evil existed which should be done away with, namely, interstate commerce in filled milk, lacking the vitamins of milk and containing a substitute which contained none of such vitamins and the use of which among uninformed people has dangerous consequences in the rearing of children. Thus the probable evil to the public welfare was established. To say that the police power of Congress over interstate commerce does not extend to prohibition of interstate trade in an article the use of which is shown to be fraught with danger to the health and growth of infants, the future generations of the nation's citizens, is to put at naught the greatest power of any government—indeed the essential purpose of all government—to protect the public welfare; to ignore the public necessity; to place upon Congress a strait jacket and to deny adequate protection to those who create the government. In all such situations private business must give way to public necessities.

Plaintiff's contention of unconstitutionality apparently is based upon Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas. 1918E, 724, and Bailey v. Drexel Furniture Co., 259 U.S. 20, 42 S.Ct. 449, 66 L. Ed. 817, 21 A.L.R. 1432. The first involved the constitutionality of a statute prohibiting the transportation in interstate commerce of goods made by child labor; the second that of an act which imposed a tax upon the net income of persons employing child labor. In each the Supreme Court held the enactment beyond the power of the federal government. It is obvious that articles made by child labor are not per se harmful or dangerous to the general welfare or the public good. Their use, so far as articles of commerce is concerned, has no deleterious effect. The goods thus manufactured are in no wise different from the same articles manufactured by other labor. But in the instant case Congress has the same right and power to prohibit the traffic as the power to prohibit traffic in misbranded or adulterated foods and drugs, lottery tickets, or in women for the purposes of prostitution. We are dealing with an article of food, which, when used as it is used, becomes injurious to the public health. Its indiscriminate sale by grocers as milk works a fraud upon the public with resulting danger to the health and growth of the members there-

of, within Brooks v. United States, supra. And Congress has said that interstate commerce, over which it has control, may not be so utilized. The language of Mr. Justice Taft in the last-mentioned case is pertinent: "In Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724, it was held that a federal law forbidding the transportation of articles manufactured by child labor in one state to another was invalid because it was really not a regulation of interstate commerce but a congressional attempt to regulate labor in the state of origin by an embargo on its external trade. Articles made by child labor and transported into other states were harmless and could be properly transported without injuring any person who either bought or used them. In referring to the cases already cited, upon which the argument for the validity of the Child Labor Act (Comp.St.§§ 8819a–8819s) was based, this court pointed out that in each of them the use of interstate commerce had contributed to the accomplishment of harmful results to people of other states, and that the congressional power over interstate transportation in such cases could only be effectively exercised by prohibiting it. The clear distinction between authorities first cited and the Child Labor Case leaves no doubt where the right lies in this case." See, also, the opinion of Mr. Justice Hughes in Seven Cases v. United States, 239 U.S. 510, 36 S.Ct. 190, 60 L. Ed. 411, L.R.A.1916D, 164, wherein the court held constitutional the Food and Drugs Act, 21 U.S.C.A. § 1 et seq.

Remembering that if the character or intended use of the article may, debatably, be harmful to the health of the people, the Legislature is entitled to its own judgment, not to be superseded by the personal opinions of judges or by verdicts of juries upon the issue which the Legislature has decided, it follows that the law is constitutional.

The contention that the fact that the labels tell the truth nullifies illegality is answered by Mr. Justice Holmes in Hebe v. Shaw, 248 U.S. 297, 39 S.Ct. 125, 126, 63 L.Ed. 255, as follows: "It is true that so far as the question of fraud is concerned the label on the plaintiffs' cans tells the truth—but the consumer in many cases never sees it. * * * The purposes to secure a certain minimum of nutritive elements and to prevent fraud may

be carried out in this way even though condensed skimmed milk and Hebe both should be admitted to be wholesome. The power of the legislature 'is not to be denied simply because some innocent articles or transactions may be found within the proscribed class. The inquiry must be whether, considering the end in view, the statute passes the bounds of reason and assumes the character of a merely arbitrary fiat.'" And here, as there, whether the milk is as free from positively injurious ingredients as is condensed milk is wholly beside the question as long as it is used as an instrument of fraud. Such was the conclusion of the Supreme Court of Wisconsin in State ex rel. Carnation Milk Prod. Co. v. Emery, 178 Wis. 147, 189 N.W. 564, 565, where the court said: "The compound is not deleterious in itself, but it is not of the same quality or food value as the genuine evaporated milk. It is lacking in a certain chemical substance known as vitamines A, which are essential elements of a proper dietary. These vitamines may be supplied by other foods. It is admitted that the compound is not a proper substitute for the genuine for infants. * * * It has been held that, where the objection to the constitutionality of a statute turns on the question as to its reasonableness under the police power, such history may be very persuasive. Certainly on the question of whether it is a debatable subject it is pertinent to know that the matter has been generally debated. * * * The compounds manufactured and sold by the plaintiffs and other companies are in exact imitation of the genuine evaporated milk. They are produced and sold by the manufacturer cheaper than the genuine. They are not of equal food value as the genuine. They may be sold, however, and are susceptible of being sold to the public for the genuine at the same price. They are therefore capable of being used for fraudulent purposes and to deceive purchasers. The temptation of retail dealers is to sell the cheaper article in place of the more expensive article to increase their profits. If used as a substitute for milk, the public health may be impaired, not because the compounds are in themselves deleterious, but because they lack in certain food elements essential to a well-balanced dietary. It was competent, therefore, for the Legislature to find that the manufacture and sale of the compounds in question were conducive to fraud and deception, and likely to be injurious to the public health. Having so found, as we must conclude it did, it is not for this court to set its judgment against that of the Legislature."

So this court, bearing in mind the legislative history of this legislation, observing the facts produced therein, will not, indeed, may not, set its judgment against that of the Congress. Plaintiff came in court as the violator of the law. The action of the District Court dismissing its bill was correct. The decree is affirmed.