## CAROLENE PRODUCTS CO. et al. v. UNITED STATES.

No. 5169.

Circuit Court of Appeals, Fourth Circuit.

Jan. 10, 1944.

Samuel H. Kaufman, of New York City, and Howard D. Matthews, of Wheeling, W.Va. (Edward Rohr, of New York City, Handlan, Garden & Matthews, of Wheeling, W.Va., and Kaufman & Cronan, of New York City, on the brief), for appellants.

Joe V. Gibson, U.S. Atty., of Kingwood, W.Va., and Mark C. Reno, Sp. Asst. to Atty. Gen. (Ezra E. Hamstead, Asst. U.S. Atty., of Morgantown, W.Va., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

The United States District Court for the Northern District of West Virginia convicted the Carolene Products Company, its president, Charles Hauser, and its Vice-President, William H. Hartke, of a violation of the Filled Milk Act of 1923, 42 Stat. 1486, 21 U.S.C.A. § 61 et seq. The facts are undisputed and we accordingly adopt the following statement made by the court below, 51 F.Supp. 675, 676:

"The Carolene Products Company is a Michigan corporation, whose sole business is the sale of three products, known respectively as 'Milnot,' 'Milnut,' and 'Carolene.' Milnut was, briefly, a product resulting from the mixture of coconut oil, skimmed milk, and fish oils. Milnot was the same product except that cottonseed oil was substituted for coconut oil. Both of these products are sold under the name of 'Carolene.' Since, for the purpose of this case the distinction between the three products is entirely immaterial, I will refer to the company's product as 'Carolene' throughout this opinion.

"Carolene is manufactured by the Litchfield Creamery Company, a corporation, operating creameries in Litchfield, Illinois, and Warsaw, Indiana. Throughout this opinion all dates, when material, will be as of the year 1941, unless specifically stated otherwise.

"The defendant, Charles Hauser, was President of the Carolene Products Company; was one of the original incorporators thereof, and a director of that company. The defendant William H. Hartke was President of the Litchfield Creamery Company and Vice-President of the Carolene Products Company. The main offices of the Carolene Products Company were maintained at the Litchfield Creamery Company's Litchfield plant and the same rooms in that plant served for offices of both the Carolene Products Company and the Litchfield Creamery Company. Charles Hauser's office was in the Litchfield Creamery Company's plant, from which office he carried on his duties in relation to both companies. This same office was used by Hartke to transact his business in connection with the two companies. In short, the Carolene Products Company was a corporation, which marketed one of the products of the Litchfield Creamery Company.

"The indictment in this case, as noted above, is brought under Title 21 U.S.C.A. Sections 61, 62, and 63, which read as follows:

"'Section 61. Filled Milk; definitions. Whenever used in sections 62 and 63 of this title—

"'(a) The term "person" includes an individual, partnership, corporation, or association.

"'(b) The term "interstate or foreign commerce" means commerce (1) between any State, Territory, or possession, or the District of Columbia, and any place outside

thereof; (2) between points within the same State, Territory, or possession, or within the District of Columbia, but through any place outside thereof; or (3) within any Territory or possession, or within the District of Columbia; and

" '(c) The term "filled milk" means any milk, cream, or skimmed milk, whether or not condensed, evaporated, concentrated, powdered, dried, or desiccated, to which has been added, or which has been blended or compounded with, any fat or oil other than milk fat, so that the resulting product is in imitation or semblance of milk, cream, or skimmed milk, whether or not condensed, evaporated, concentrated, powdered, dried, or desiccated. This definition shall not include any distinctive proprietary food compound not readily mistaken in taste for milk or cream or for evaporated, condensed, or powdered milk, or cream where such compound (1) is prepared and designed for feeding infants and young children and customarily used on the order of a physician; (2) is packed in individual cans containing not more than sixteen and one-half ounces and bearing a label in bold type that the content is to be used only for said purpose; (3) is shipped in interstate or foreign commerce exclusively to physicians, wholesale and retail druggists, orphan asylums, child-welfare associations, hospitals, and similar institutions and generally disposed of by them.

" '§ 62. Same; manufacture, shipment, or delivery for shipment in interstate or foreign commerce prohibited. It is declared that filled milk, as herein defined, is an adulterated article of food, injurious to the public health, and its sale constitutes a fraud upon the public. It shall be unlawful for any person to manufacture within any Territory or possession, or within the District of Columbia, or to ship or deliver for shipment in interstate or foreign commerce, any filled milk.

" '§ 63. Same; penalty for violations of law; acts, omissions, and so forth, of agents. Any person violating any provision of sections 61 and 62 of this title shall upon conviction thereof be subject to a fine of not more than $1,000 or imprisonment of not more than one year, or both. When construing and enforcing the provisions of said sections, the act, omission, or failure of any person acting for or employed by any individual, partnership, corporation, or association, within the scope of his employment or office, shall in every case be deemed the act, omission, or failure, of such indivi-

dual, partnership, corporation, or association, as well as of such person.'

"The indictment is in eight counts, charging eight separate shipments of filled milk from Warsaw, Indiana, to Clarksburg, Parkersburg, Weston, Morgantown, and Moundsville, in the Northern District of West Virginia. All these shipments were made between February and July of the year 1941, and totalled 5,800 cases, of 48 cans to the case.

"Many of the pertinent facts were stipulated upon the trial of this case. Such proof as the Government did introduce was not denied by the defendants. Therefore, there is really no dispute as to the facts involved. They are briefly as follows:

"The Litchfield Creamery Company would bring into its Warsaw, Indiana, plant, whole milk procured from the farmers in that vicinity. The cream was then separated from this milk. To the skimmed milk thus obtained was added a sufficient quantity of cottonseed oil to replace the butter fat extracted with the cream. There was also added a small quantity of high potency fish-liver oil to introduce vitamins A and D into the product. The entire product was then evaporated to the consistency of that ordinarily found in condensed whole milk. It was then homogenized; that is, it was forced under great pressure through small openings, resulting in the breaking up of the fat globules in the cottonseed oil and distributing the same evenly through the entire body of the resulting mixture, thus insuring that when this product was canned the oil would not rise to the top but would remain suspended through the entire volume of milk. Upon the completion of the evaporation and homogenization, the product was placed in cans, the cans labeled and packed in cases. The cases, in turn, were placed in the warehouse at Warsaw. Thompson, the manager of the Warsaw plant, was originally employed by Hauser. He received his orders as to bills of lading from Hartke and Hauser.

"The Company had salesmen calling upon the various wholesale grocers in the country and soliciting and taking orders for 'Carolene.' These orders were sent into the main office at Litchfield, and the Litchfield Office would then contact the plant at Warsaw, usually by telephone, sometimes by written order, and instruct the Manager of the Warsaw plant to ship a designated number of cases of Carolene

to a given purchaser. These cases were shipped by railway freight, the Carolene Products Company being designated as consignor. Payment for the goods was made to the office at Litchfield, checks being banked with a rubber-stamp endorsement of the Carolene Products Company.

"This same business was being carried out at the Litchfield plant; however, in this particular case, all shipments were actually made from Warsaw.

"In the year 1941, the Warsaw plant sold 440,000 cases, and the Litchfield plant, 1,-150,000 cases, of Carolene. Approximately half of this total output was shipped in interstate commerce.

"The product 'Carolene' looked, tasted, and smelled like condensed whole milk and was of practically the same texture and consistency. It was packed in cans of the same size and shape customarily employed by packers of condensed, whole milk. * * *

"The contention of the defendants was that the product 'Carolene' was a wholesome, nutritive article of food; that their labels properly branded the article; and that no fraud was perpetrated upon the public by its sale. For this reason they maintained that the filled milk act did not apply to this product. There is no contention by the Government that the defendants' labels violate any Act of Congress or regulation passed thereunder, and the labeling question is completely outside of this case. The other part of the defense, namely, that the product is wholesome and nutritive was argued at great length and with much ability by counsel for the defendants, both in their oral presentation and in their briefs filed with the Court. That argument boils down to about this contention, that about the time the filled milk act was passed, the commercial fortification of food products by the addition of vitamins not naturally present was not known to science. They contend that in 1923 medical science knew very little about vitamins. They further contend that Congress' purpose in passing the filled milk act in 1923 was to keep the public from using as food a milk product from which the essential vitamins had been removed, and that now, in the light of present knowledge, it is possible to replace these vitamins by the addition of fish oil, and that, therefore, their product 'Carolene' is not such a product as was intended by Congress to be prohibited; or that if the Court holds that it is such a product, that then the Act is unconstitutional."

The several defendants thus contend that (1) Carolene is a wholesome and nutritive food, (2) Carolene is not "in imitation or semblance of milk, cream or skimmed milk whether or not condensed", and (3) the labels on Carolene properly brand the article, so that no fraud is perpetrated on the public in its sale. For these reasons they allege that the Filled Milk Act of 1923 does not apply to Carolene.

Defendants further insist that if Carolene is held to be within the prohibition of the Act, then the Act is unconstitutional when so applied. The argument in this connection is that when Congress passed the Act in 1923 medical science knew very little about vitamins; and therefore the Congressional intent in enacting the statute was to protect the public against milk products from which the essential vitamins had been removed. Since the addition of fish oil to Carolene replaced the lost vitamins, defendants contend, there is no justification in fact or in law for their conviction under the statute as written and enacted.

The court below has carefully analyzed and unhesitatingly rejected each of these contentions. We agree with these conclusions and we feel further that the discussion in the written opinion of the District Court encompasses every aspect of the case in so lucid a manner that it is not necessary for us to repeat what has there been said.

In our recent decision of Fides, A. G. v. Commissioner of Internal Revenue, 137 F.2d 731, decided August 16, 1943, we had occasion to develop at great length the important difference between the legislative and judicial functions in connection with statutory interpretation. Much of what was stated in the Fides case is applicable to the instant situation. The fact that the inclusion of Carolene within the ambit of the statute leads to a seemingly harsh and inequitable result does not justify our giving to the statute the restrictive construction for which the defendants contend. This matter is one for the consideration of the legislature and not the courts. Cf. United States ex rel. Marcus v. Hess, 317 U.S. 537, 546, 63 S.Ct. 379. Our notion of expediency and propriety may not be substituted for the considered will of Congress, expressed in the clear and unambiguous terms of the Act. See,

also, Purity Extract & Tonic Co. v. Lynch, 226 U.S. 192, 33 S.Ct. 44, 57 L.Ed. 184.

The power of the legislature cannot be denied merely because an innocent article may conceivably fall within the class prohibited by the statute. Carolene Products Co. v. Hanrahan, 1941, 291 Ky. 417, 164 S.W.2d 597. Congress may with constitutional impunity bar from interstate commerce goods which may be the subject of a fraudulent sale, although the goods themselves may not be injurious. Seven Cases of Eckmans Alterative v. United States, 239 U.S. 510, 36 S.Ct. 190, 60 L.Ed. 411, L.R.A.1916D, 164.

The problem of the sale of filled milk products has had the frequent consideration of several state legislatures as well as the attention of Congress. An impressive array of courts, state and federal, has refused to accept the very contentions now presented to us by the defendants. United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234; United States v. Carolene Products Co., 7 Cir., 104 F.2d 969; Hebe v. Shaw, 248 U.S. 297, 39 S.Ct. 125, 63 L.Ed. 255; Carolene Products Co. v. Evaporated Milk Ass'n, 7 Cir., 93 F.2d 202; Carolene Products Co. v. Wallace, D.C., 27 F.Supp. 110, affirmed 307 U.S. 612, 59 S.Ct. 1033, 83 L.Ed. 1495; Setzer v. Mayo, 150 Fla. 734, 9 So.2d 280; State of Kansas ex rel. Mitchell v. Sage Stores Co., 157 Kan. 404, 141 P.2d 655, decided by Kansas Supreme Court, October 2, 1943. Contra: Mahoney v. Carolene Products Co., 1 Cir., 2 F.2d 366. It would serve no useful purpose to repeat the arguments advanced in these authorities. They are adequately discussed in the opinion below and we accept the conclusions therein reached, which are adverse to the contention of the defendants.

The individual defendants, Hauser and Hartke, next urge that they may not be held criminally liable for the illegal acts of the corporation. In this connection, the Government expressly admits that there is no evidence in the record to show that either of the individual defendants personally made, or even had any personal knowledge of, the eight specific shipments set out in the indictment. In their plea in abatement, however, Hauser and Hartke swore that the Carolene Products Company's "business in interstate commerce was very substantial during the past years. Its business has been built up and developed by long and persistent effort and at great expense." Each stated these facts were true "of his own knowledge".

Furthermore, as was found by the court below 51 F.Supp. 680:

" * * * the evidence conclusively shows that the individual defendants were the active, directing heads of both the Carolene Products Company and its parent corporation, the Litchfield Creamery Company, and that as such directing heads, they caused the Carolene Products Company to engage in an extensive shipment of Carolene in interstate commerce. In this connection it should be borne in mind that the Carolene Products Company had only one business, which was the sale of Carolene. Half of this business consisted of sales which resulted in shipping the product in interstate commerce. Therefore, under my ruling, 50% of the company's business was illegal. We do not here have the case of a corporation engaged in a proper and legal enterprise with an occasional violation of Federal law resulting therefrom. We have a case in which 50% of the company's business resulted in violations of the Filled Milk Act. No one could read the record in this case and come to any conclusion other than that Mr. Hartke and Mr. Hauser knew that the company was shipping this product in interstate commerce practically every business day. We must also bear in mind that intent is not a necessary element of this offense. * * *

"Hauser was President of Carolene Products Company, and Hartke was Vice President. Both were directors and both maintained their offices in one of the plants in which 'Carolene' was manufactured. A corporation can act only through agents. Speaking with precise technical accuracy, it may be said that what happened in each instance alleged in the indictment was that the corporation, Carolene Products Company, committed the specific offense, and that the defendants, Charles Hauser, President, and William H. Hartke, Vice President, willfully and actively aided and abetted the corporation in this regard. There is an abundance of evidence in the record to convince me, beyond a reasonable doubt, that that was precisely what the two individual defendants did in this case; hence, since they are proven by the evidence to have been aiders and abettors, they must, under Title 18 U.S.C.A. Section 550, be held guilty as principals, and I now so hold them.

"As noted above, intent is not a necessary element of this offense; yet, common sense leads us to a query as to just why there is a Carolene Products Company. Hauser and Hartke had the Litchfield Creamery Company. This company was engaged in the manufacture and sale of general dairy products, including evaporated whole milk. It also manufactured this one product, 'Carolene,' which it, for some reason, did not wish to sell under its own name, and for the sale of that one product organized a separate corporation. There must have been some reason for this else why the trouble and expense of maintaining two sets of books, two organizations, etc. Often corporations resort to a subsidiary to sell substandard goods. We all know that many of our large concerns sell defective products, 'seconds,' by this means. But here, the defendants contended in their plea, demurrer, and all through the trial, that 'Carolene' is as good and wholesome as condensed milk. There may be a legitimate answer, not in the record, but only one occurs to me, and that is that Hauser and Hartke knew Carolene violated the filled milk act and organized the company to protect the Litchfield Creamery Company from a violation of the law."

■ There is ample authority in support of the principle that the directing heads of a corporation which is engaged in an unlawful business may be held criminally liable for the acts of subordinates done in the normal course of business, regardless of whether or not these directing heads personally supervised the particular acts done or were personally present at the time and place of the commission of these acts. See United States v. Dotterweich, 64 S.Ct. 134, decided by the Supreme Court on November 22, 1943; Wood v. United States, 4 Cir., 204 F. 55; Anstess v. United States, 7 Cir., 22 F.2d 594; Johnson v. United States, 9 Cir., 62 F.2d 32; Reid v. United States, 7 Cir., 44 F.2d 51; Crall & Ostrander v. Commonwealth, 1905, 103 Va. 855, 49 S.E. 638; People v. Detroit White Lead Works, 1890, 82 Mich. 471, 46 N.W. 735, 9 L.R.A. 722; State v. Gilbert, 1933, 213 Wis. 196, 251 N.W. 478; State v. Burnam, 1912, 71 Wash. 199, 128 P. 218.

■ In the light of the record of this case, we are inexorably forced to the conclusion that the individual defendants are both chargeable under the law with knowledge of the eight specific unlawful shipments by the corporation as set out in the indictment. Hauser and Hartke are therefore each criminally responsible for the illegal conduct of the Carolene Products Company, in connection with these shipments.

This brings us to the final error alleged to have been committed by the District Court. The individual defendants, Hartke and Hauser, were called to the stand as government witnesses, testifying without objection. Hartke first gave his name and residence and stated that he was a stockholder and president of the Litchfield Company in 1941. He was then asked whether the company made a report to the Secretary of State of Illinois for the year 1941, whereupon objection was made that the witness was a defendant in a criminal case and should not be examined. The question was not further pressed, but counsel stipulated as to the official connection between Hartke and Hauser and the company in 1941. Hartke then testified, without objection, that he had been connected with the Litchfield Company since 1920, and with the Carolene Company since its incorporation. Objection to further testimony was again made and no further questions were asked. A motion to exclude the evidence so far as it applied to the witness was granted, with the consent of the District Attorney. The government then proved the connection of the individual defendants with the two corporations by certificate from the records of the state of incorporation.

Later in the trial the defendant, Hauser, was called to the stand by the United States. Objection was immediately made and no questions were asked other than the name of the witness, to which he made no reply. Defendants' counsel then moved for a directed verdict for the individual defendants but the motion was denied.

■ In this ruling there was no error. In so far as the purpose of calling the individual defendants to the stand related to the production of corporate records, the government was within its rights, for it is generally held in the federal courts that officers of a corporation may be required to produce and identify the corporate records even though the records may tend to incriminate them. Wilson v. United States, 221 U.S. 361, 384, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas.1912D, 558; United States v. Austin-Bagley Corp., 2 Cir., 31 F.2d 229, 233, certiorari denied 279 U.S. 863, 49 S.Ct. 479, 73 L.Ed. 1002;

United States v. Illinois Alcohol Co., 2 Cir., 45 F.2d 145, certiorari denied 282 U.S. 901, 51 S.Ct. 214, 75 L.Ed. 794; In re Verser-Clay Co., 10 Cir., 98 F.2d 859, 120 A.L.R. 1098, certiorari denied 306 U.S. 639, 59 S.Ct. 487, 83 L.Ed. 1040, and elaborate note in 120 A.L.R. 1102. Furthermore, the testimony actually elicited from the individual defendants was not only stricken out so far as it related to them, but was in substance actually introduced into the case by exhibits or by stipulation of counsel. Under these circumstances, there was no reversible error in refusing to enter a verdict for the individual defendants; but it is obvious that the practice of calling individual defendants to the stand in a criminal case is a dangerous one which should be employed only with scrupulous regard for their constitutional rights.

For the reasons assigned, the judgment of the District Court is affirmed.

Affirmed.